No. 16-16065

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

### DAVID J. RADICH and LI-RONG RADICH,

**Plaintiffs-Appellees,**

**vs.**

**ROBERT GUERRERO, in his official capacity as CNMI Commissioner of Public Safety, and LARISSA LARSON, in her official capacity as CNMI Secretary of Finance,**

**Defendants;**

**TANAPAG MIDDLE SCHOOL PARENT TEACHER STUDENT ASSOCIATION,**

**Movant-Appellant.**

_____

**On Appeal from the District Court for the Northern Mariana Islands**
**District Court No. 1:14-cv-00020**

_____

### APPELLANT'S BRIEF

_____

JOSEPH E. HOREY
O'CONNOR BERMAN DOTTS & BANES
201 Marianas Business Plaza
Nauru Loop, Susupe, Saipan, CNMI
Mail: P.O. Box 501969 Saipan MP 96950
Phone No. (670) 234-5684
Fax No. (670) 234-5683
E-mail: josephhorey@pacific-lawyers.com

Counsel for Appellant

# TABLE OF CONTENTS

INTRODUCTION                                                1

STATEMENT OF JURISDICTION                                   2

STATEMENT OF ISSUES PRESENTED FOR REVIEW                    3

STATEMENT OF THE CASE AND OF THE FACTS                      5

    The Nature of the Case                                  5

    The Facts, Course of Proceedings, and Disposition Below  5

SUMMARY OF ARGUMENT                                         8

ARGUMENT                                                    9

    I.    THE APPEAL IS NOT MOOT                           9

        A.  The District Court Denied Intervention
Based on Mootness.                                          9

        B.  Repeal of a Challenged Law Does Not Moot
the Challenge Unless the Law Clearly Will Not
Be Reenacted                                               11

        C.  The CNMI Handgun Ban Would Clearly Be
Reenacted If Appellants Prevail.                           17

    II.   THE COVENANT DOES NOT EXTEND HELLER
AND MCDONALD TO THE CNMI.                                  20

        A.  The Covenant Is Unclear On Its Face Whether Heller
and McDonald Apply.                                        20

        B.  The Covenant's Framers Did Not Intend the Second
Amendment To Apply Against the
CNMI Government                                            24

C.  The Framers' Intent Should Be Effectuated.                    27

D.  The District Court's Construction Is Inconsistent
    With the Founding Intent.                                     30

E.  The District Court's Construction Is Also Inconsistent
    With the Covenant's Purpose.                                  31

F.  The Application of the Second Amendment Can Be
    Affirmed Only If Freely Revocable By the People.              34

CONCLUSION                                                        37

STATEMENT OF RELATED CASES                                        38

# TABLE OF AUTHORITIES

**US-NMI Covenant**

| | |
|---|---|
| Preamble | 32, 36 |
| Section 101 | 32 |
| Section 103 | 32, 36 |
| Section 105 | 32, 36 |
| Section 501 | 20, 21, 23, 35 |
| Section 903 | 2 |

**Cases**

| | |
|---|---|
| Ballen v. City of Redmond, 466 F.3d 736 (9th Cir. 2006) | 14 |
| Barilla v. Ervin, 886 F.2d 1514 (9th Cir. 1989) | 13, 16 |
| Brown v. General Services Administration, 425 U.S. 820 (1976) | 28 |
| Buono v. Norton, 371 F.3d 543 (9th Cir. 2004) | 4 |
| Carreras v. City of Anaheim, 768 F.2d 1039 (9th Cir. 1985) | 17 |
| Charles v. Daley, 749 F.2d 452 (7th Cir. 1984) | 15, 16 |
| Chemical Producers & Distributors Assn. v. Helliker, 463 F.3d 871 (9th Cir. 2006) | 13, 15, 16 |
| Chevron Oil Co. v. Huson, 404 U.S. 97 (1971) | 29 |
| Chisholm v. Georgia, 2 U.S. 419 (1793) | 35 |

Citizens United v. Federal Election Commission,
558 U.S. 310 (2010)                                          35

City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283 (1982)    11, 13, 17

Commonwealth of the Northern Mariana Islands v. Atalig,
723 F.2d 682 (9th Cir. 1984)

Cooper v. McBeath, 11 F.3d 547 (5th Cir. 1994)               16

Coral Construction Co. v. King County,
941 F.2d 910 (9th Cir. 1991)                                 12, 13

Davis v. Commonwealth Election Commission,
9th Cir. App. No. 14-16090                                   34, 38

Deja Vu of Nashville, Inc. v. Metropolitan Govt. of Nashville &
Davidson County, Tenn., 274 F.3d 377 (6th Cir. 2001)         15

District of Columbia v. Heller, 554 U.S. 570 (2008)         1, 20, 21, 25

Dorr v. United States, 195 U.S. 138 (1904)                  36

Duncan v. Louisiana, 391 U.S. 145 (1945)

Fang Lin Ai v. United States, 809 F.3d 503 (9th Cir. 2015)   4, 5, 22

Foster v. Carson, 347 F.3d 742 (9th Cir. 2003)              3

Fournier v. Sebelius, 718 F.3d 1110 (9th Cir. 2013)         4

Friends of the Earth, Inc. v. Laidlaw Environmental Services
(TOC), Inc., 528 U.S. 167 (2000)                            11, 13

Gale v. Andrus, 643 F.2d 826 (D.C.Cir. 1980)                32, 33

Halladay ex rel. A.H. v. Wenatchee School District,
598 F. Supp. 2d 1169 (E.D. Wash. 2009)                      10

Home Bldg. & Loan Assn. v. Blaisdell, 290 U.S. 398 (1934)     28

Jacobus v. Alaska, 338 F.3d 1095 (9th Cir. 2003)     12

Klamath Water Users Protective Assn. v. Patterson,
204 F.3d 1206 (9th Cir. 1999)     4

Log Cabin Republicans v. United States,
658 F.3d 1162 (9th Cir. 2011)     13, 16

McDonald v. City of Chicago, 561 U.S. 742 (2010)     1, 20, 21,
22, 23, 37

Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139 (2010)     10

National Advertising Co. v. City of Miami,
402 F.3d 1329 (11th Cir. 2005)     15

Native Village of Noatak v. Blatchford,
38 F.3d 1505 (9th Cir. 1994)     13, 14, 16

Northeastern Fla. Chapter of Associated Gen. Contractors
of America v. City of Jacksonville, 508 U.S. 656 (1993)     12

Northern Mariana Islands v. United States (I),
279 F.3d 1070 (9th Cir. 2002)     5, 22

Northern Mariana Islands v. United States (II),
399 F.3d 1057 (9th Cir. 2005)     5

Nunez-Reyes v. Holder, 646 F.3d 684 (9th Cir. 2011)     29

Orange County v. Air California,
799 F.2d 535, 537 (9th Cir. 1986)     3

Oregon v. Mitchell, 400 U.S. 112 (1970)     3, 5

Patel v. Kent School District, 648 F.3d 965 (9th Cir. 2011)     10

People of Saipan v. U.S. Dept. of Interior,
502 F.2d 90 (9th Cir. 1974)                                          4

Pollock v. Farmers' Loan and Trust Co., 157 U.S. 429 (1895)         35

Presser v. Illinois, 116 U.S. 252 (1886)

Qwest Corp. v. City of Surprise, 434 F.3d 1176 (9th Cir. 2006)      17

Rayphand v. Sablan, 95 F.Supp.2d 1133 (D.N.M.I. 1999)               36, 37

Sabangan v. Powell, 375 F.3d 818 (9th Cir. 2004)                    5

Sagana v. Tenorio, 384 F.3d 731 (9th Cir. 2004)                     32

Scott v. Sandford, 60 U.S. 393 (1857)                              35

Silveira v. Lockyer, 312 F.3d 1052 (9th Cir. 2002)                 21

Smith v. Univ. of Washington Law School,
233 F.3d 1188 (9th Cir. 2000)                                       16

Stevens v. United States, 440 F.2d 144 (6th Cir. 1971)

Temengil v. Trust Territory of the Pacific Islands,
881 F.2d 647 (9th Cir. 1989)                                        32

Thalheimer v. City of San Diego, 645 F.3d 1109 (9th Cir. 2011)     12, 14

United States v. Cabaccang, 332 F.3d 622 (9th Cir. 2003)           4

United States v. Classic, 313 U.S. 299 (1941)                      32

United States v. Concentrated Phosphate Export Assn.,
393 U.S. 199 (1968)                                                 11, 13

United States v. Cruikshank, 92 U.S. 542 (1875)                    21

United States v. Emerson, 270 F.3d 203 (5th Cir. 2001)             21

United States v. Johnson, 497 F.2d 548 (4th Cir. 1974)    21

United States v. Miller, 307 U.S. 174 (1939)    21

United States v. W. T. Grant Co., 345 U.S. 629 (1953)    13

United States ex rel. Richards v. Deleon Guerrero,
4 F.3d 749 (9th Cir. 1993)    5

Van Ort v. Estate of Stanewich, 92 F.3d 831 (9th Cir. 1996)    10

Wabol v. Villacrusis, 958 F.2d 1450 (9th Cir. 1992)    36

Rayphand v. Sablan, 95 F.Supp. 2d 1133 (D.N.M.I. 1999)    25

Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. 217 (1996)

**US Statutes**

28 U.S.C. § 1291    2

28 U.S.C. § 1294    2

48 U.S.C. § 1801    2

48 U.S.C. § 1821    2

48 U.S.C. § 1822    2

48 U.S.C. § 1824    2

**CNMI Statutes**

6 CMC § 2222    6, 17, 18

CNMI PL 19-42 (SAFE Act)    6, 9, 17

**CNMI Resolutions**

House Resolution 19-44    7, 18

**Rules**

Fed. R. App. P. 4(a)(1)(A)                                           3

**Covenant Negotiating History**[1]

Marianas Political Status Commission,
Position Paper Regarding the
Future Political Status of Mariana Islands
(May 10, 1973)                                                      22

Unknown Author,
Analysis of Political and Legal Nature of Relationship
(January 1974)                                                     22

Marianas Political Status Commission,
Memorandum Re: Marianas – Applicability of the US Constitution
(April 1974)                                                       23, 24

Marianas Political Status Commission,
Memorandum Re: Constitutional Rights Made Applicable
to the States Under the Fourteenth Amendment
(May 6, 1974)                                                      23, 24

Office for Micronesian Status Negotiations,
Memorandum Re: Marianas Commonwealth,
Application of Articles of the U.S. Constitution
(July 8, 1974)                                                     22

---

[1]     These documents can be found online at the website of the Northern Marianas Humanities Council (http: // northernmarianashumanities.org / sec.asp?secID=21), under the heading "The Northern Mariana Islands Original Historical Documents on Development of a U.S. Commonwealth, 1960-1977," or directly at http://nmhcdigitalarchive.org/ histdoc1960_1977/.

**NMI Constitution Drafting History**[2]

Briefing Paper No. 7: Bill of Rights
(October 8, 1976)      25

Committee on Personal Rights and Natural Resources
Committee Recommendation No. 4: Personal Rights
(October 29, 1976)      26

Proposed Amendment No. 37
(November 20, 1976)      27

Committee on Personal Rights and Natural Resources
Report to the Convention Re:
Amendment of Article I on Personal Rights
(November 22, 1976)      27

Verbatim Journal, Day 36
(November 22, 1976)      27

**News Articles**

Cherrie Anne H. Villahermosa, "House says no to emergency
session; Senate passes gun-control bill,"
Marianas Variety (March 31, 2016)      7

Dennis B. Chan, "Govt officials still insist on appeal to gun ruling,"
Saipan Tribune (April 5, 2016)      7, 19

SPNGraphics1, "'Torres' use of another lawyer to argue appeal
probably inappropriate,'"
Saipan Tribune (April 6, 2016)      7, 19

---

[2]      These documents can be found online at the Humanities Council website cited above, under the heading, "The Making of a Constitution. Documents from NMI Constitutional Conventions," or directly at http://nmhcdigitalarchive.org/ConConVer.1.0/.

Dennis B. Chan, "Senate passes sweeping gun bill,"
Saipan Tribune (April 7, 2016)                                    19

**Other**

RESTATEMENT (SECOND) OF TORTS § 320                               10

Howard P. Willens & Deanne C. Siemer,
*The Constitution of the Northern Mariana Islands:*
*Constitutional Principles and Innovation in a Pacific Setting*,
65 GEORGETOWN L.J. 1373 (1977)                                   25

122 Cong. Rec. 7272 (1976)                                       34

**INTRODUCTION**

Ever since its days as a trust territory under U.S. administration, the Commonwealth of the Northern Mariana Islands (CNMI) has categorically prohibited the possession and importation of handguns. Left to its own devices, it would do so still. The district court in this case, however, held that this long-standing and widely popular prohibition violated the Second Amendment, as construed in District of Columbia v. Heller, 554 U.S. 570 (2008) and McDonald v. City of Chicago, 561 U.S. 742 (2010). The district court, essentially, went one step beyond McDonald. McDonald had held that Heller bound the states via the Fourteenth Amendment; the district court in this case held that it also bound the CNMI via the US-CNMI Covenant – this despite the fact that the framers of the Covenant, when they adopted the Second Amendment for the CNMI, demonstrably understood it to protect against federal action only, not to eliminate the CNMI government's power to continue to restrict handguns as they had always been restricted. Appellant Intervenor asks the Court to adopt the true lesson of Heller and McDonald – which, properly understood, is not that everyone has a right to a handgun, but rather that *the intent of the framers controls* – and effectuate the intention and understanding of the framers of the Covenant by allowing the CNMI to preserve and protect its anti-handgun policies.

## STATEMENT OF JURISDICTION

This case presents a controversy arising under the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (hereinafter COVENANT).[1] The district court therefore had jurisdiction to adjudicate the case pursuant to Section 903 of the Covenant[2] and 48 U.S.C. § 1821-22.[3] This Court has jurisdiction to review the judgment of the district court pursuant to 48 U.S.C. § 1824,[4] 28 U.S.C. § 1291,[5] 48 U.S.C. § 1821(a),[6] and 28 U.S.C. § 1294.[7]

---

[1] The Covenant is reprinted as a note to 48 U.S.C. § 1801.

[2] *See* COVENANT § 903 (providing that cases or controversies arising under the Covenant will be justiciable in courts established by the constitution or laws of the United States).

[3] *See* 48 U.S.C. § 1821-22 (establishing the District Court for the Northern Mariana Islands and granting it "the jurisdiction of a District Court of the United States").

[4] *See* 48 U.S.C. § 1824 (providing that those portions of Title 28 of the United States Code which apply to the District Court of Guam shall apply to the District Court for the Northern Mariana Islands).

[5] *See* 28 U.S.C. § 1291 (establishing appellate jurisdiction of the courts of appeals over final orders of the District Court of Guam).

[6] *See* 48 U.S.C. § 1821(a) (placing the Northern Mariana Islands in same judicial circuit as Guam).

[7] *See* 28 U.S.C. § 1294 (placing Guam in the Ninth Circuit).

The judgment in this case was entered May 9, 2016, and was a final judgment disposing of all claims of all parties in the case. *See* ER 27. The Notice of Appeal was filed June 8, 2016, *see* ER 25, and was timely, having been filed within thirty days after the entry of judgment, as provided in Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The preliminary issue presented for review is whether the district court erred in denying Appellant's motion to intervene in the case below. "A district court's denial of a party's motion to intervene as a matter of right is reviewed *de novo,* except for the issue of timeliness, which is reviewed for abuse of discretion," while "[p]ermissive intervention is committed to the broad discretion of the district court and is therefore reviewed . . . for abuse of discretion." <u>Orange County v. Air California</u>, 799 F.2d 535, 537, 539 (9th Cir. 1986) (citations omitted). In this case, the basis for the district court's denial of the intervention was its determination of mootness, an issue which is also reviewed de novo. *See, e.g.*, <u>Foster v. Carson</u>, 347 F.3d 742, 745 (9th Cir. 2003) ("We review de novo the question whether a case is moot.").

If the court finds that intervention was wrongly denied, then the substantive question arises of whether the district court erred in holding, on a motion for summary judgment, that the Covenant extends the full current

federal interpretation of the Second Amendment to the CNMI. Grant of summary judgment reviewed de novo. <u>Buono v. Norton</u>, 371 F.3d 543, 545 (9th Cir. 2004) ("We review the grant of summary judgment de novo."). This Court has recently stated that "[t]he Covenant is best viewed as a congressionally approved compact that is both a contract and a statute[.]" <u>Fang Lin Ai v. United States</u>, 809 F.3d 503, 507 fn. 4 (9th Cir. 2015) (internal punctuation omitted). As such, review of its interpretation is de novo. *See, e.g.*, <u>Klamath Water Users Protective Assn. v. Patterson</u>, 204 F.3d 1206, 1210 (9th Cir. 1999) ("The interpretation of a contract is a mixed question of law and fact subject to de novo review."); <u>United States v. Cabaccang</u>, 332 F.3d 622, 624–25 (9th Cir. 2003) ("The construction or interpretation of a statute is a question of law that we review de novo."). The Covenant is also the fundamental constitutional document of the US-CNMI political union,[8] and as such is also interpreted de novo. *See, e.g.,* <u>Fournier v. Sebelius</u>, 718 F.3d 1110, 1117 (9th Cir. 2013) ("We review de novo a district court's constitutional rulings[.]").[9] In conducting such

---

[8] *Cf.* <u>People of Saipan v. U.S. Dept. of Interior</u>, 502 F.2d 90, 98 (9th Cir. 1974) ("[T]he Trusteeship Agreement constitutes the plaintiffs' basic constitutional document.").

[9] This Court has in fact regularly reviewed interpretations of the Covenant de novo, although not always saying so or saying why. *See, e.g.*, <u>Fang Lin Ai</u>, *supra*, 809 F.3d at 506 (de novo interpretation of COVENANT §

review, "resort to extrinsic evidence of the Covenant's negotiations is entirely appropriate." Fang Lin Ai, *supra*, 809 F.3d at 507 fn. 4 (internal punctuation omitted). *See also, e.g.*, NMI v. US I, *supra*, 399 F.3d at 1064 (considering "the expansive records of the Covenant's negotiation and history to extract the agreement's meaning").

## STATEMENT OF THE CASE AND OF THE FACTS[10]

### The Nature of the Case.

The case originated as a constitutional challenge to a CNMI statute prohibiting the possession and importation of handguns. It now implicates the additional issue of whether Appellant – a middle school parent-teacher-student association in the CNMI – should be permitted to intervene for purposes of taking an appeal.

### The Facts, Course of Proceedings, and Disposition Below.

David and Li-Rong Radich, a married couple living on Saipan in the CNMI, sought to obtain a handgun, assertedly for personal protection after

606); Northern Mariana Islands v. United States, 399 F.3d 1057, 1063-66 (9th Cir. 2005) (de novo interpretation of COVENANT § 801); Sabangan v. Powell, 375 F.3d 818 (9th Cir. 2004) (de novo interpretation of COVENANT § 501); Northern Mariana Islands v. United States, 279 F.3d 1070 (9th Cir. 2002) (de novo interpretation of COVENANT § 502); United States ex rel. Richards v. Deleon Guerrero, 4 F.3d 749, 753-55 (9th Cir. 1993) (de novo interpretation of COVENANT §§ 103 & 105).

[10]    The facts and course of proceedings being inextricably intertwined in this matter, they are presented together herein.

an assault incident at their home, but were prohibited from doing so by CNMI law, most directly by 6 CMC § 2222(e), which provided: "No person shall [i]mport, sell, transfer, give away, purchase, possess or use any handgun[.]" ER 249-50.

The Radiches brought an action in the district court against the pertinent CNMI officials, seeking declaratory and injunctive relief to the effect that the CNMI handgun prohibition "violate[d] [their] individual right to keep and bear arms for self-defense as secured by the Second Amendment to the United States Constitution." ER 251.

On March 28, 2015, the district court granted summary judgment in the Radiches' favor. ER 8.

The district court's order sparked a flurry of activity in various quarters. Almost immediately after the court issued its ruling, the CNMI Attorney General presented to the CNMI Legislature a draft firearms regulation bill, which ultimately passed and became CNMI Public Law 19-42, known as the "SAFE Act," a copy of which appears in the Addendum (hereinafter Add.) at 1. Among its various provisions, the SAFE Act repealed the handgun prohibition in 6 CMC § 2222(e). Add. 5.

At the same time, the CNMI House of Representative passed a resolution expressing disapproval of the district court's ruling and urging the

Attorney General to appeal it.  *See* CNMI H. Res. 19-44 (App. 57).[11]  The

CNMI Governor also publicly expressed support for an appeal.[12]  However,

the CNMI Attorney General repeatedly expressed reluctance to appeal.[13]

When the Governor suggested that he might pursue an appeal through

independent counsel, the Attorney General opined that doing so would be

"inappropriate."[14]

---

[11]　*See also* Dennis B. Chan, "Govt officials still insist on appeal to gun ruling," Saipan Tribune (April 5, 2016), ER 32C.

[12]　*See id*., ER 32D ("Gov. Ralph DLG Torres wants to appeal or stay the U.S. District Court for the NMI ruling to strike down parts of Commonwealth gun law, allowing for handguns in the NMI"); SPNGraphics1, "'Torres' use of another lawyer to argue appeal probably inappropriate,'" Saipan Tribune (April 6, 2016), ER 32F ("The Torres administration . . . is willing to test the possibility of having another counsel argue the appeal[.]").

[13]　*See, e.g.*, Cherrie Anne H. Villahermosa, "House says no to emergency session; Senate passes gun-control bill," Marianas Variety (March 31, 2016), ER 32B ("[AG] Manibusan replied that [appeal] was not an option because it would be just a waste of time."); Dennis B. Chan, "Govt officials still insist on appeal to gun ruling," Saipan Tribune (April 5, 2016), ER 32D ("CNMI Attorney General Edward Manibusan . . . has said the CNMI's success of appeal is 'almost nothing at all[.]'"); SPNGraphics1, "'Torres' use of another lawyer to argue appeal probably inappropriate,'" Saipan Tribune (April 6, 2016), ER 32F ("Manibusan . . . has publicly shot down the chances of success of an appeal[.]")

[14]　SPNGraphics1, "'Torres' use of another lawyer to argue appeal probably inappropriate,'" Saipan Tribune (April 6, 2016), ER 32F.

Appellant, the Parent-Teacher-Student Association of Tanapag Middle School on Saipan, CNMI, concerned about the impact of the district court's ruling on the safety and well-being of the school's students in the school, home and community, and perceiving that the ruling would likely not be appealed by the Attorney General, then moved for leave to intervene for purposes of taking an appeal itself. ER 31-32.

The district court denied intervention, finding that an appeal would be moot in light of the passage of the SAFE Act. ER 1. This appeal ensued.

## SUMMARY OF ARGUMENT

This appeal is not moot. The burden was on the Radiches, as the party asserting mootness, to show that it was absolutely clear that the handgun prohibition would not be re-enacted by the CNMI in the event the district court was reversed on appeal. They did not, and, under the circumstances, could not, meet this burden. Intervention should therefore have been allowed.

The Second Amendment does not limit the power of the local CNMI government to regulate or prohibit handguns. The understanding of the framers of the Covenant was that it limited only the federal government. This original understanding and intent ought to be effectuated. To do otherwise would be to defeat the purpose of the Covenant to establish a self-

governing Commonwealth.  The holding of the district court on the merits should therefore be reversed.

## ARGUMENT

## I.  THE APPEAL IS NOT MOOT.

### A.  The District Court Denied Intervention Based on Mootness.

In the district court's order denying Appellant's motion to intervene, it initially appears that intervention was denied for three separate and distinct reasons:

> The Court will deny PTSA's motion for three reasons: (1) PTSA cannot satisfy Rule 24's requirements for intervention as of right; (2) PTSA lacks standing; and (3) the subject of this lawsuit, and the issue PTSA wishes to challenge, is moot and no longer forms a case or controversy subject to this Court's jurisdiction.

ER 3.  It quickly becomes clear upon further reading, however, that the first two of these reasons are, in substance, merely different ways of stating the third – *i.e*, that the enactment of the SAFE Act mooted any appeal.  For example, the district court found that the PTSA could not satisfy the Rule 24 intervention requirement of an "interest" because the SAFE Act now authorizes handgun possession.  ER 4.  Similarly, it found the standing requirements of causation and redressability lacking because of the

enactment of the SAFE Act.  ER 5-6.[15]  All of these are various ways of stating what the district court itself describes as the "central problem" – that "the lawsuit into which [the PTSA] seeks to intervene was mooted by legislative action."  ER 6.

---

[15]    To the extent the district court found lack of "specificity and imminence" independent of mootness, ER 5, it did so by mischaracterizing the PTSA's asserted interest.  The PTSA's interest does not arise solely from the increased danger of actual gun violence in school, home and community, but also from the present necessity to take steps to protect students against it.  *See generally* ER 30-32 (PTSA president explaining concerns).  The need to take precautionary measures of this type "are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis."  Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 155 (2010).

The immediacy of the interest is brought more sharply into focus by the fact that the need for preparation results not only from practical concerns, but from an enhanced legal duty of those charged with the care of schoolchildren.  *See, e.g.*, Patel v. Kent School District, 648 F.3d 965, 972-73 (9th Cir. 2011) ("[S]tate tort doctrine requires schools to anticipate dangers which may reasonably be anticipated and then take precautions to protect the pupils from those dangers.") (internal quotation marks omitted); Van Ort v. Estate of Stanewich, 92 F.3d 831, 841 (9th Cir. 1996) ("[S]chool districts have an affirmative duty to take all reasonable steps to protect their students.  This includes protecting students against private actors[.]") (citations omitted); Halladay ex rel. A.H. v. Wenatchee School District, 598 F. Supp. 2d 1169, 1174 (E.D. Wash. 2009) ("The court asks whether the harm that occurred is of a sort that was within a general field of danger that should have been anticipated.") (citations and internal punctuation marks omitted); RESTATEMENT (SECOND) OF TORTS § 320 (recognizing same principle); *id.* at cmt. a ("The rule stated in this Section is applicable to . . . teachers or other persons in charge of a public school."); *id.* at cmt. d ("One who has taken custody of another may not only be required to exercise reasonable care for the other's protection when he knows or has reason to know that the other is in immediate need of it, but also to make careful preparations to enable him to give effective protection when the need arises, and to exercise reasonable vigilance to ascertain the need of giving it.").

**B. Repeal of a Challenged Law Does Not Moot the Challenge Unless the Law Clearly Will Not Be Reenacted.**

The voluntary cessation of a challenged practice does not moot the challenge. On the contrary "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 189 (2000) (*quoting* City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)).

> In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."

Friends of the Earth, *supra*, 528 U.S. at 189 (*quoting* United States v. Concentrated Phosphate Export Assn., 393 U.S. 199, 203 (1968)). Furthermore, "[t]he heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* (internal punctuation omitted).

This "voluntary cessation" principle applies when a governmental body amends or repeals a challenged law. *See, e.g.*, City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 & n. 10 (1982) (repeal of a portion

of an ordinance held invalid by the district court did not moot review of the disputed provision).

> Although the challenged statutory language at issue in <u>City of Mesquite</u> had been eliminated while the case was pending in the Court of Appeals, we held that the case was not moot, because the defendant's "repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated."

<u>Northeastern Fla. Chapter of Associated Gen. Contractors of America v. City of Jacksonville</u>, 508 U.S. 656, 662 (1993) (*quoting* <u>City of Mesquite</u>, *supra*, 455 U.S. at 289). *See also, e.g.*, <u>Thalheimer v. City of San Diego</u>, 645 F.3d 1109 (9th Cir. 2011) (amendment to challenged city ordinance did not moot challenge, due to "the well-settled principle that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice") (*quoting* <u>Jacobus v. Alaska</u>, 338 F.3d 1095, 1103 (9th Cir. 2003); <u>Carreras v. City of Anaheim</u>, 768 F.2d 1039, 1047 (9th Cir. 1985)). In such cases, mootness "is not a jurisdictional issue; rather, [the Court] may continue to exercise authority over a purportedly moot case where the balance of interests favors such continued authority." <u>Coral Construction Co. v. King County</u>, 941 F.2d 910, 927 (9th Cir. 1991)

On the subject of *when* "the balance of interests favors such continued authority," this Court has described its own pronouncements as "somewhat

12

confused."[16]  That is unfortunately true;[17] nevertheless, it is clear enough

that the ultimate question controlling the determination of whether repeal of

a challenged law moots the challenge is whether it is reasonably likely that

the law will be reenacted once any legal obstacle to doing so is removed.  At

one end of the spectrum, the case is not moot when reenactment is "virtually

---

[16]     *See* Jacobus v. Alaska, 338 F.3d 1095, 1103 (9th Cir. 2003) ("Our circuit, perhaps following the lead of the Supreme Court, has issued somewhat confused pronouncements regarding mootness generally, and mootness in the context of repealed or amended statutes in particular.").

[17]     For example, the Court has sometimes suggested that mootness will be prevented only in cases where reenactment is "virtually certain." *See*, *e.g.*, Log Cabin Republicans v. United States, 658 F.3d 1162, 1167 (9th Cir. 2011). That, of course, is the direct opposite of the Concentrated Phosphate rule that mootness will only *occur* when it is "absolutely clear" that the challenged conduct will *not* recur.  *See* Friends of the Earth, *supra*, 528 U.S. at 189 (*quoting* Concentrated Phosphate, 393 U.S. at 203 (1968)).  This Court has also once stated that "voluntary cessation is different from a statutory amendment or repeal," Log Cabin, *supra*, 658 F.3d at 1167, despite the fact that the rule for statutory amendment or repeal enunciated in City of Mesquite is explicitly an application of the already "well settled" voluntary cessation rule of such cases as Concentrated Phosphate, *supra*, and United States v. W. T. Grant Co., 345 U.S. 629, 632 (1953).  *See* City of Mesquite, *supra*, 485 U.S. at 289 & n. 10.

certain."[18]    At the other end, it *is* moot when there is "no indication whatsoever" of reenactment.[19]

    In deciding the question of mootness, therefore, courts have looked to a variety of factors bearing in one way or another on the question of likelihood of reenactment.  For example, reenactment of the challenged legislation is seen as particularly likely – even "virtually certain" – when the legislature has expressly announced its intention of doing so.[20]  That, however, is not the only circumstance that will preclude a finding of mootness.  Reenactment has also been found sufficiently likely to avoid mootness when the legislation at issue was only repealed or amended in the

---

[18]    *See, e.g.*, Native Village of Noatak v. Blatchford, 38 F.3d 1505, 1510 (9th Cir. 1994); Chemical Producers & Distributors Assn. v. Helliker, 463 F.3d 871, 878 (9th Cir. 2006)

[19]    *See, e.g.*, Barilla v. Ervin, 886 F.2d 1514, 1521 (9th Cir. 1989), *overruled on other grounds by* Simpson v. Lear Astronics Corp., 77 F.3d 1170, 1174 (9th Cir. 1996)) ("no indication whatsoever that the Oregon legislature intends to repeal the statutory amendments").  *But see* Coral Construction Co. v. King County, 941 F.2d 910, 928 (9th Cir. 1991) ("[E]ven if the government is unlikely to reenact the provision, a case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the provision.").

[20]    *See, e.g.*, Ballen v. City of Redmond, 466 F.3d 736, 741 (9th Cir. 2006) (appeal not moot: "[T]he City has steadfastly threatened to re-enact the old ordinance if it receives a favorable outcome on this appeal.").

first place as a direct consequence of the district court's decision.[21]  By contrast, reenactment has been found unlikely when the change in law is unrelated to the action.[22]  Actions by officials of the defendant government, short of outright promises to reenact, from which their intention to do so can nonetheless be inferred also militate against a finding of mootness,[23] as does the jurisdiction's manifest tendency to tailor its laws "to reflect the latest judicial pronouncements" on the subject at issue.[24]  This Court attempted on

---

[21]  *See, e.g.*, Thalheimer, *supra*, 645 F.3d at 1126 (appeal not moot: "These concerns are of particular force in a case like the present one, in which the 'voluntary cessation' occurred only in response to the district court's judgment.") (*quoting* Jacobus, *supra*, 338 F.3d at 1103).

[22]  *See, e.g.*, Native Village of Noatak v. Blatchford, 38 F.3d 1505, 1511 (9th Cir. 1994) (appeal moot: "[t]his is not a case where a defendant voluntarily ceases challenged action in response to a lawsuit.").

[23]  *See, e.g.*, Deja Vu of Cincinnati, LLC v. Union Township Bd. of Trustees, 326 F.3d 791, 804-05 (6th Cir. 2003) (appeal not moot: "Although the Township has not explicitly announced its intention to reenact the challenge provisions if we were to reverse . . . the fact that the Attorney General has filed a cross-appeal infers that it would."); National Advertising Co. v. City of Miami, 402 F.3d 1329, 1334 (11th Cir. 2005) (noting that, in prior case, the city's conduct, including the filing of a motion to dismiss one day after amendment of challenged law, had convinced the court of likelihood of reenactment).

[24]  *See, e.g.*, Charles v. Daley, 749 F.2d 452, 457-458 (7th Cir. 1984) (appeal not moot: "[T]he history of the [Illinois] Abortion Law suggests that the State has attempted repeatedly to alter the contours of that statute to reflect the latest judicial pronouncements in the area of abortion and privacy.").

one occasion to distinguish among the various cases on their facts, based on whether the laws at issue were the enactments of a state or those of a municipality or administrative agency;[25] but this apparent dichotomy arises more from coincidence than from the application of any legal principle.[26]

---

[25]     *See* Chemical Producers & Distributors Assn. v. Helliker, 463 F.3d 871, 878 (9th Cir. 2006) ("The cases we cited in Jacobus for a near categorical rule of mootness are cases of statutory amendment. The examples we cited of continuing federal adjudicatory power are of local government or administrative agency repeal or amendment.").

[26]     For example, it is not borne out in decisions of other circuits. *See, e.g.*, Charles v. Daley, 749 F.2d 452, 457-458 (7th Cir. 1984) (challenge to Illinois state statute not moot despite amendment); Cooper v. McBeath, 11 F.3d 547, 551 (5th Cir. 1994) (challenge to Texas state statute not moot despite amendment).

Furthermore, the cases of this circuit that Helleker describes as reflecting a "near categorical view of mootness" for state laws are ones in which the court actually found no objective likelihood of re-enactment. *See* Native Village of Noatak v. Blatchford, 38 F.3d 1505, 1511 (9th Cir. 1994) ("it is unlikely that the challenged statute and regulations will be reenacted"); Barilla, *supra*, 886 F.2d at 1521 (finding "no indication whatsoever that the Oregon legislature intends to repeal the statutory amendments"); Smith v. Univ. of Washington Law School, 233 F.3d 1188, 1195 (9th Cir. 2000) (finding "no real expectation that the alleged wrongs will recur"). Indeed, in Helliker itself, the court found "no reason to think the California legislature enacted the amendment with a mind to restoring the old law later." 463 F.3d at 878. *See also, e.g.*, Log Cabin Republicans, *supra*, 658 F.3d at 1167 ("We can only speculate" whether Congress will reenact repealed policy).

Finally, Helliker provided no explanation as to why the state-local distinction should make a difference. There is no evident facial nexus between that distinction and the ultimate question of likelihood of re-enactment, unless it is simply that on the theory that is easier, thus more likely, for a small jurisdiction to change positions than for a large one, just

The point of distinction more broadly reflected in the cases, and bearing the imprimatur of the Supreme Court, remains whether the party asserting mootness can how that "the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary." City of Mesquite, *supra*, 455 U.S. at 289 n. 10 (*quoting* Concentrated Phosphate).[27]

## C.  The CNMI Handgun Ban Would Clearly Be Reenacted If Appellants Prevail.

In this case, the Radiches cannot make such a showing.  The repeal of 6 CMC § 2222(e) by the SAFE Act was clearly in direct response to the district court's decision, and never would have been occurred otherwise. The SAFE Act itself states as much:

> Unfortunately, on March 28, 2016, the United States District Court for the District of the Northern Mariana Islands held that the Second Amendment applies to the Commonwealth.  The Legislature therefore finds that it is in the best interest of the Commonwealth to update the Commonwealth's gun control laws to reflect this new reality.

---

as it is easier for a canoe to reverse course than a battleship.  If so, the CNMI (population 53,883 as of the 2010 census, a figure that would rank it 166th among the cities of California), would clearly fall on the "canoe" side of the line.

[27]    *See also, e.g.*, Carreras v. City of Anaheim, 768 F.2d 1039, 1047 & n. 19 (9th Cir. 1985) (remanding for determination whether the likelihood of future violations was "sufficiently remote to make injunctive relief unnecessary"); Qwest Corp. v. City of Surprise, 434 F.3d 1176, 1181 (9th Cir. 2006) ("Where the challenged law would likely be reenacted, courts have refused to find the issue moot.").

Add. 3. The Legislature recognizes that repeal of the handgun is contrary to public opinion – an opinion, moreover, with which the Legislature itself agrees:

> [T]he Legislature finds that the *vast majority* of the inhabitants of the Commonwealth *strongly oppose* the legalization of handguns because they *rightly* fear that the largescale introduction of handguns will undermine our peaceful communities.

App. 1-2 (emphasis added). The Legislature thus makes it unmistakably clear that it is changing the law only reluctantly and only under what it perceives to be extreme legal duress:

> *Unfortunately*, the current firearms laws of the Commonwealth, and the People's desire to prevent the introduction of handguns into our communities, are at odds with the Second Amendment to the United States Constitution. . . . Therefore, the Legislature *reluctantly* accepts that it must legalize the ownership and possession of firearms to the extent required by the Second Amendment.

Add. 2 (emphasis added). The Legislature is also explicitly tailoring its laws so as "to reflect the latest judicial pronouncements" on the subject at issue. *See* Add. 3-4 (citing and adopting the legislative histories of various recent gun-control measures, and citing the cases that have upheld them).

Significantly, moreover, the Legislature plainly had no intent, by repealing 6 CMC § 2222(e), to moot an appeal from the district court's decision. On the contrary, the House of Representatives, even as it voted to

18

enact the SAFE Act, also adopted a resolution denouncing the decision, and urging the Attorney General to appeal it. *See* CNMI H. Res. 19-44 (Add. 57) (sponsored by nineteen members of the 20-member house). The Governor of the Commonwealth also urged appeal.[28] Even the Attorney General, who disparaged the prospects of success on appeal, did not regard the SAFE Act as mooting the very possibility, continuing to discuss the matter with the Governor.[29] While there were opposing views within the CNMI Government regarding the likelihood of success of an appeal,[30] there can be no doubt that if the appeal *were* successful, the CNMI would waste

---

[28]    *See* Dennis B. Chan, "Govt officials still insist on appeal to gun ruling," Saipan Tribune (April 5, 2016), ER 32D ("Gov. Ralph DLG Torres wants to appeal or stay the U.S. District Court for the NMI ruling to strike down parts of Commonwealth gun law, allowing for handguns in the NMI"); SPNGraphics1, "'Torres' use of another lawyer to argue appeal probably inappropriate,'" Saipan Tribune (April 6, 2016), ER 32F ("The Torres administration . . . is willing to test the possibility of having another counsel argue the appeal[.]").

[29]    *See* Dennis B. Chan, "Senate passes sweeping gun bill," Saipan Tribune (April 7, 2016), ER 32I ("While the bill made its way through both houses of the Legislature, talks of an appeal of the U.S. District Court for the NMI's ruling continued . . .Torres and Manibusan are set to meet this morning on the matter.").

[30]    The Attorney General's defeatism is baffling to Appellant. He had, by his own (somewhat boastful but nonetheless accurate) account, "admirably and tirelessly" fought for two years to protect the Commonwealth people's rights in this case, *see* SAFE Act, App. 3, only to then give up in despair based on nothing more than the district court having ruled against him.

no time in reinstituting its long-standing handgun prohibition. The appeal is therefore not moot, and the Court should proceed to consideration of the merits.

## II. THE COVENANT DOES NOT EXTEND <u>HELLER</u> AND <u>MCDONALD</u> TO THE CNMI.

### A. The Covenant Is Unclear On Its Face Whether <u>Heller</u> and <u>McDonald</u> Apply.

On the merits, the district court held that the rights protected by the Second Amendment, as described in <u>Heller</u> and <u>McDonald</u>, fully apply in the CNMI. ER 10-12. *See generally* <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008) (holding that the Second Amendment protects an individual right to gun possession, including handguns); <u>McDonald v. City of Chicago</u>, 561 U.S. 742 (2010) (holding that the Fourteenth Amendment extends the Second Amendment to the states)). It based this conclusion on COVENANT § 501(a), which lists both the Second Amendment and section 1 of the Fourteenth Amendment among those provisions of the U.S Constitution applicable in the CNMI. ER 11.

However, since the Covenant was entered into in 1975, prior to the decisions in <u>Heller</u> and <u>McDonald</u>, the question necessarily and inherently arises whether the Second and Fourteenth Amendments, as adopted by the CNMI in the Covenant, should be construed consistently with those later

cases, or whether they should instead be construed as they were understood in 1975, which was contrary to both <u>Heller</u>[31] and <u>McDonald</u>.[32]  The district court found there to be no "ambiguity" on this point, *see* ER 12-13, but Section 501(a) can clearly be read and understood in two different ways: 1) that the current, post-<u>McDonald</u>, Second Amendment applies in the CNMI as if it were one of the several states, in which case it applies in full force against the local government; or 2) that the *pre*-<u>McDonald</u> Second Amendment applies in the CNMI as if it were one of the several states, in which it case it does not apply against the local government at all, and protects only against federal action.  Thus, even if a textual ambiguity in the

---

[31]     At the time of the Covenant, the Second Amendment was consistently held to protect only a collective, not an individual, right to bear arms.  *See, e.g.*, <u>United States v. Johnson</u>, 497 F.2d 548, 550 (4th Cir. 1974) ("The courts have consistently held that the Second Amendment only confers a collective right of keeping and bearing arms."); <u>Stevens v. United States</u>, 440 F.2d 144, 149 (6th Cir. 1971) ("[T]here can be no serious claim to any express constitutional right of an individual to possess a firearm.") (*both citing* <u>United States v. Miller</u>, 307 U.S. 174 (1939)).  This "collective right" view of the Second Amendment would not be disavowed by any circuit court prior to <u>United States v. Emerson</u>, 270 F.3d 203 (5th Cir. 2001), which re-opened the issue and led ultimately to <u>Heller</u>.  *See generally* <u>Silveira v. Lockyer</u>, 312 F.3d 1052, 1060-66 (9th Cir. 2002) (reviewing history).

[32]     *See, e.g*, <u>United States v. Cruikshank</u>, 92 U.S. 542, 553 (1875) ("The second amendment declares that [the right to bear arms] shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress."); <u>Presser v. Illinois</u>, 116 U.S. 252, 265 (1886) ("[T]he [second] amendment is a limitation only upon the power of congress and the national government, and not upon that of the state[.]").

Covenant is required in order to permit reference to its negotiating history, such an ambiguity certainly exists in this case.[33]

The ambiguity is particularly strong with respect to <u>McDonald</u>, given that the subject matter of Section 501(a) – the application of particular constitutional provisions to the CNMI as if it were a state – is so closely related to the question at issue in <u>McDonald</u>, namely what constitutional provisions apply to a state. Unlike a state, which, upon admission, automatically adopts the entire US Constitution – the CNMI adopted the US Constitution on a clause-by-clause, sometimes issue-by-issue basis. *See* COVENANT § 501(a).[34] It is therefore likely that, in the case of any given

---

[33] In fact, none is required. This Court's holding in <u>Fang Lin Ai</u>, *supra*, that "resort to extrinsic evidence of the Covenant's negotiations is entirely appropriate" 809 F.3d at 507 fn. 4, was in response to just such a "plain meaning" reading that the district court employs in this case. Nor has the Court required an ambiguity before considering such material in other cases. *See, e.g.*, <u>NMI v. US I</u>, *supra*, 399 F.3d at 1064 (considering "the expansive records of the Covenant's negotiation and history to extract the agreement's meaning").

[34] *See also, e.g.*, Marianas Political Status Commission, Position Paper Regarding the Future Political Status of Mariana Islands (May 10, 1973) at 5-6, ¶ D (ER 40-41) ("There are some provisions [of the Constitution] which may not be appropriate to the Marianas . . ."); Unknown Author, Analysis of Political and Legal Nature of Relationship (January 1974) at ¶8 (ER 50) ("The parties are currently studying other provisions of the U.S. Constitution, which should be explicitly considered in the Status Agreement."); Office for Micronesian Status Negotiations, Memorandum Re: Marianas Commonwealth, Application of Articles of the U.S.

constitutional provision, the framers had a specific intent as to whether or not it should apply. And, since they provided for the application of each provision to the NMI "as if the Northern Mariana Islands were one of the several States," it is also likely that they specifically considered, and had a specific understanding as to, whether and how each provision applied to the States, thus whether and how it would apply to the NMI if included in Section 501(a) of the Covenant. The historical record shows that they did indeed consider the issue in these terms.[35]

Because the change McDonald wrought goes to an issue that was both directly considered by the framers and fundamental to the whole system created by the Covenant – the categorical question, not of what a given constitutional provision means, but of whether that provision applies to the CNMI at all – McDonald, at least, differs not only in form, but in substance, from the various cases that have established other surprising, and perhaps

Constitution (July 8, 1974) (ER 126-131) (discussion of application of articles of the U.S. Constitution).

[35] *See, e.g.*, Marianas Political Status Commission, Memorandum Re: Marianas – Applicability of the US Constitution (April 1974) (ER 56-125) (discussion and comparison of the constitutional provisions proposed for the Marianas by both sides); Marianas Political Status Commission, Memorandum Re: Constitutional Rights Made Applicable to the States Under the Fourteenth Amendment (May 6, 1974) (ER 132-33) (listing all "those Amendments to the Constitution which have been made applicable to the States under the Fourteenth Amendment," with accompanying citations).

unwelcome, constitutional interpretations. *Cf.* ER 16 ("This case differs only in substance, not in form.").

### B. The Covenant's Framers Did Not Intend the Second Amendment To Apply Against the CNMI Government.

The historical record is clear that the Covenant framers did *not* understand the Second Amendment to apply against state action, and thus, when agreeing that it would apply in the CNMI as if the CNMI were one of the states, they did not understand or intend it to apply against actions of the CNMI government. The following, for example, appears in the record:

> This amendment, noting the necessity of a well-regulated militia to the security of a free state, prohibits infringement by Congress of the right to keep and bear arms, *but it does not extend this prohibition to state action*. Thus . . . the amendment would impose no special obligations on the Mariana[s] government[.]

Marianas Political Status Commission, Memorandum: Marianas – Applicability of the U.S. Constitution (April 1974) at 11 (ER 66) (*citing* Presser) (emphasis added). *See also, e.g.,* Marianas Political Status Commission, Memorandum Re: Constitutional Rights Made Applicable to the States Under the Fourteenth Amendment (May 6, 1974) at 2 (ER 133) (listing the Second Amendment among those "[a]mendments wherein applicability to the States under the Fourteenth Amendment *does not apply*") (emphasis in original) (*citing* Presser).

This same understanding is confirmed by the record of the First NMI Constitutional Convention.[36]  The Convention's briefing paper on the bill of rights[37] is explicit that the right applies only against the federal government. *See* Briefing Paper No. 7: Bill of Rights (October 8, 1976) at 50 (ER 188) (discussing it under the heading "Rights Secured by the United States Constitution But Not Applicable Against the Northern Marianas government"); *id.* at fn. 123 (ER 188) ("The Supreme Court, has limited the Second Amendment's protection to only infringement by Congress, not by any state regulatory scheme.") (*citing* Cruikshank); *id.* at Appendix A (ER 206) (listing the Second Amendment right to bear arms as "applicable under Covenant only to federal government.").  The significance of this limited application is explained generally as follows:

---

[36]    Inquiry into "the public understanding of a legal text in the period after its . . . ratification" is a recognized as a "critical tool of constitutional interpretation." Heller, 554 U.S. at 605. *See also, e.g.*, Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. 217, 226 (1996) (noting that the aids to the interpretation of a treaty include not only the "negotiating and drafting history" but also "the postratification understanding of the contracting parties").

[37]    The briefing papers "were submitted to the delegates before the opening of the Convention" and served to explain the basic legal background against which the delegates were working.  Willens & Siemer, *The Constitution of the Northern Mariana Islands: Constitutional Principles and Innovation In a Pacific Setting*, 65 GEORGETOWN L.J. 1373, 1585-86 (1977).

> With respect to each of the federal rights not made applicable against the Commonwealth government under the Covenant . . . omission will mean that the right is not secured against the Commonwealth government, either by the federal or the Commonwealth Constitution.

*Id*. at 4 (ER 141).   And it is explained with particular reference to the right to bear arms as follows:

> If the Commonwealth Constitution is silent [on the right to bear arms], the people are protected against federal action in this area by the United States Constitution, but the Commonwealth government could prohibit the possession of all firearms if that were deemed appropriate.

*Id*. at 51 (ER 190).[38]

The Convention's initial draft of what is now Article I of the Commonwealth Constitution, dealing with personal rights, included a section based on the Second Amendment, as follows:

> Section 7: Availability of a Militia.  In order that a militia may be available if necessary in times of emergency, the right of the people to keep and bear arms shall not be infringed.

Committee on Personal Rights and Natural Resources Committee Recommendation No. 4: Personal Rights (October 29, 1976) (ER 227). Delegate Joaquin S. Torres, however, proposed an amendment that would substitute the following language:

---

[38]   Due to an apparent clerical error, two pages of this document appear in reverse order (ER 189 and ER 190).

> Section 7: Gun Control. The legislature shall by law restrict the right of persons living in the Commonwealth to own hand guns. The laws enacted pursuant to this section shall contain no exceptions except those required for the public safety.

Proposed Amendment No. 37 (November 20, 1976) (ER 229). The Committee ended up by clarifying that its intention with Section 7 had been only to guarantee the availability of the militia in case of emergency, "eliminat[ing] the confusion" by deleting Section 7 altogether, and recommending the withdrawal of Delegate Torres' proposed amendment on the ground that it constituted a "legislative matter." Committee on Personal Rights and Natural Resources, Report to the Convention Re: Amendment of Article I on Personal Rights (November 22, 1976) at 3 (ER 232). *See also* Verbatim Journal, Day 36 (November 22, 1976) at 2 (ER 235) (same).

All of this goes to show that, when the framers agreed that the Second Amendment would apply to the CNMI as if it were one of the states, their intent was that it would protect against federal action, but not against state (*i.e.*, Commonwealth) action.

## C. The Framers' Intent Should Be Effectuated.

The ultimate goal of constitutional interpretation is to ascertain and give effect to the intent of the framers and ratifiers of the provision being

construed.[39]   It is, therefore, of no import whether the framers' understanding of the Second and Fourteenth Amendments was, in any abstract sense, correct.  Apparently, in light of <u>Heller</u> and <u>McDonald</u>, it was not.  The very fact that it was their understanding, however, means that it is correct for purposes of construction of the Covenant.[40]

This is not to say that the construction, with respect to the CNMI, of those parts of the U.S. Constitution applicable there must, in all cases, be limited to their pre-1975 constructions, and that no post-1975 decisions are binding there.  That is a larger question that need not be reached in this case. It could plausibly be argued that their meaning indeed is and should be frozen in time as of 1975, since to adopt later interpretations would be to bind the CNMI people to a rule of law to which they never consented.  It could also plausibly be argued that the people implicitly agreed to adopt a

---

[39]   *See, e.g.*, <u>Home Bldg. & Loan Assn. v. Blaisdell</u>, 290 U.S. 398, 453 (1934) ("The whole aim of construction, as applied to a provision of the Constitution, is to discover the meaning, to ascertain and give effect to the intent of its framers and the people who adopted it.")

[40]   *See generally, e.g.,* <u>Brown v. General Services Administration</u>, 425 U.S. 820, 828 (1976) ("Whether [the] understanding of Congress was in some ultimate sense incorrect is not what is important in determining the legislative intent in amending the 1964 Civil Rights Act to cover federal employees. For the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was.").

"living" constitution, and that post-1975 constructions are therefore all applicable, absent evidence of actual contrary intent. And it could plausibly be argued that some intermediate rule should be adopted, whereby post-1975 constructions are generally applicable in the CNMI, except under certain exceptional circumstances, analogous to the principles governing whether a new rule announced by a court is to be applied prospectively only.

> The Supreme Court has stated those principles as follows:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that we must weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. Finally, we have weighed the inequity imposed by retroactive application, for where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the injustice or hardship by a holding of nonretroactivity.

Chevron Oil Co. v. Huson, 404 U.S. 97, 106-7 (1971) (citations and internal punctuation omitted). *See also, e.g.*, Nunez-Reyes v. Holder, 646 F.3d 684, 691 (9th Cir. 2011) (en banc) ("We apply the three-pronged test outlined in Chevron Oil (1) in a civil case; (2) when we announce a new rule of law, as distinct from applying a new rule that we or the Supreme Court previously announced; (3) and when the new rule does not concern our jurisdiction.").

All that need be decided here is that, where a subsequent interpretation is directly contrary to the known understanding of the framers, it may not be adopted, based on the fundamental principle that the intent of the framers is paramount.

## D. The District Court's Construction Is Inconsistent With the Founding Intent.

The district court infers a different, counterfactual, intent, from the fact that the Covenant expressly excludes the right to "indictment by grand jury," which at the time was held inapplicable to the states. This shows, according to the court, that the framers anticipated new rights being applied in the future, and sought to guard against it in that case and no other.    ER 15.   In other words, the district court asks to assume that the framers considered not only the question of what provisions of the Constitution had already been held applicable or inapplicable against the states, but also considered every possible provision that, at some unknown point in the future, the Supreme Court might decide to apply against the states, even those it had already held did not apply against them.  It ask us then to further assume that, having prognosticated all the possible permutations and ramifications of this hypothetical future jurisprudence, they decided to accept any and all of those except indictment by grand jury – *i.e.*, that they were willing to buy a "pig in a poke," and accept, willy-nilly, any

restrictions on the power of their newly created Commonwealth government that the Supreme Court might decide to throw at them in the future. The district court, in other words, would require the framers to be both prophets and gamblers, rather than what the negotiating history shows them to have been – a careful, diligent and conscientious group of men trying to locate and secure the best specific place for fit their Commonwealth in an existing political and constitutional order, which they painstakingly analyzed to that very end.[41]

### E. The District Court's Construction Is Also Inconsistent With the Covenant's Purpose.

The district court's reading is contrary to the Covenant's fundamental purpose. The Covenant, like any other constitutional document, must be read in light of its enduring nature, so as to best effectuate its fundamental purposes:

> For in setting up an enduring framework of government they undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, those fundamental purposes which the instrument itself discloses. Hence we read its words, not as we read legislative codes which are subject to

---

[41] In fact, the provision regarding indictment by grand jury appears to have evolved from a federal proposal to exclude both grand and petit juries from the CNMI altogether, including in federal cases, to which the NMI objected, resulting in the qualifying language "based on local law." *See* ER 88-90.

continuous revision with the changing course of events, but as the revelation of the great purposes which were intended to be achieved by the Constitution as a continuing instrument of government. If we remember that 'it is a constitution we are expounding,' we cannot rightly prefer, of the possible meanings of its words, that which will defeat rather than effectuate the constitutional purpose.

United States v. Classic, 313 U.S. 299, 316 (1941) (citations omitted) (*quoting* M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407 (1819)).

The fundamental and paramount purpose of the Covenant is the establishment of self-government in the CNMI. *See, e.g.*, COVENANT at preamble ("to establish a self-governing Commonwealth of the Northern Mariana Islands within the American political system"); § 101 ("will become a self-governing commonwealth"); § 103 ("will have the right of local self-government"), § 105 ("[i]n order to respect the right of self-government guaranteed by this Covenant"). Indeed, self-government was the fundamental and paramount objective of the Trusteeship which gave rise to the Covenant in the first instance. *See, e.g.,* Temengil v. Trust Territory of the Pacific Islands, 881 F.2d 647, 649 (9th Cir. 1989) ("The paramount duty of the United States was to steward Micronesia to self-government."); Gale v. Andrus, 643 F.2d 826, 830 (D.C.Cir. 1980) ("The task of the United States under the Trusteeship Agreement at issue is primarily to nurture the Trust Territory toward self-government."); Sagana v. Tenorio, 384 F.3d 731,

733 (9th Cir. 2004) ("The United States became the Trust Territory's administrator, with the responsibility of promoting the development of the inhabitants of the trust territory toward self-government or independence.") (internal punctuation omitted).

Under the Trusteeship Agreement, the United States could have developed any kind of relationship with the Northern Marianas that both parties agreed to, *so long as it was self-governing*. There could have been a relationship with or without political union, with or without US sovereignty or citizenship, with or without financial aid, and with or without the right to bear arms. There could not, however, have been one without self-government. That, and only that, was the *sine qua non*, without which there could have been no Covenant at all. *See generally* <u>Gale</u>*, supra*, 643 F.2d at 830 ("[T]he authority of the trustee is never greater than that with which it was endowed by the trust agreement."). It can well be said that self-government is the "*what"* of the Covenant; everything else is the "*how.*" The Covenant should therefore be construed so as to best effectuate that purpose. In other words, as between any two possible constructions of the Covenant, a construction providing for greater CNMI self-government is

always to be preferred over one under which self-government is curtailed.[42] The better construction is therefore the one whereby the extent of the availability of firearms is determined by the CNMI people themselves, in accordance with their own traditions and priorities, not the "pig in a poke" construction under which it is left to be determined by federal courts with no accountability to the CNMI or its people.

### F. The Application of the Second Amendment Can Be Affirmed Only If Freely Revocable By the People.

The only ground upon which the district court's decision could validly be affirmed would be upon a construction recognizing greater self-government still, in the form of the power to revoke or modify the application of the Second Amendment (or any applicable provision of the US Constitution) to them at any time by amendment of their own Commonwealth Constitution. That question of whether such a power exists is presently before this Court in Davis v. Commonwealth Election Commission, 9th Cir. App. No. 14-16090, but no decision has yet been reached.

---

[42] This construction is, moreover, also in accord with Congress' own intent that, to the extent there are any ambiguities in the Covenant, they be resolved "in favor of and to the benefit of the people and Government of the Northern Mariana Islands." 122 CONG. REC. 7272 (1976) (statement of Rep. Burton).

The people of the States, of course, have the right and power to amend the Constitution. *See generally* U.S. CONST. art. V. Although rarely exercised, this power is essential to ensure that the people's fundamental law remains consistent with their fundamental values, and is particularly necessary when courts have interpreted the Constitution in a manner deemed by the people to be inconsistent with those values.[43] The people of the States therefore could, if they chose, amend the Constitution to undo the effects of Heller, McDonald, or both.

The CNMI people, however, are excluded from participation in that amendment process.[44] In order to be able to accomplish the same result— *i.e.*, in the context of this case, to negate the application of Heller and

---

[43]    For example, the eleventh amendment was enacted in response to Chisholm v. Georgia, 2 U.S. 419 (1793) (which had held states liable to suit without their consent), the fourteenth in response to Scott v. Sandford, 60 U.S. 393 (1857) (which had denied citizenship to members of the black race), the sixteenth in response to Pollock v. Farmers' Loan and Trust Co., 157 U.S. 429 (1895) (which had held the income tax unconstitutional), and the twenty-sixth in response to Oregon v. Mitchell, 400 U.S. 112 (1970) (which had permitted states to deny the vote to persons under age 21). More recently, amendments have been proposed that would reverse the effect of Citizens United v. Federal Election Commission, 558 U.S. 310 (2010) (interpreting the first amendment to bar certain government restrictions on corporate campaign spending). *See, e.g.,* S.J.Res. 19 (113th Cong., 2d Sess.).

[44]    Article V is not among the constitutional provisions of the Constitution made applicable to the CNMI. *See* COVENANT § 501(a).

McDonald in the CNMI—the only effective means available to them is the one spelled out in the Covenant's self-government guarantee itself – through "a Constitution of their own adoption." COVENANT § 103.[45] The recognition of a local power to negate or modify the application of the Second Amendment to the CNMI is the only way in which the district court's decision could be upheld consistently with self-government.

Of course, the CNMI government, being based on the same democratic principles as that of the United States,[46] would likely not be empowered to contravene principles fundamental to all free government.[47]

---

[45] The ability to modify Covenant § 501 by mutual consent of the U.S. and CNMI governments (see COVENANT § 105) is insufficient standing alone to afford a full measure of self-government, as it affords a veto power over any proposed modification to an entity (the U.S. government) that would not itself be affected by it.

[46] See COVENANT pmbl. ("[T]he people of the Northern Mariana Islands and the people of the United States share the goals and values found in the American system of government based upon the principles of government by the consent of the governed, individual freedom and democracy[.]")

[47] This is the rule of the Insular Cases. See, e.g., Dorr v. United States, 195 U.S. 138, 148 (1904) ("fundamental right[s go] wherever the jurisdiction of the United States extends."). It has been applied as the constitutional test for actions of the United States in and toward the CNMI, and would presumably apply to actions of the CNMI government as well. See Commonwealth of the Northern Mariana Islands v. Atalig, 723 F.2d 682, 689-90 (9th Cir. 1984); Wabol v. Villacrusis, 958 F.2d 1450, 1460 (9th Cir. 1992); Rayphand v. Sablan, 95 F.Supp. 2d 1133, 1137-38 (D.N.M.I. 1999), aff'd sub nom. Torres v. Sablan, 528 U.S. 1110 (2000).

However, the prohibition of handguns would not contravene those principles. On the contrary, the <u>McDonald</u> Court itself noted that "such countries as England, Canada, Australia, Japan, Denmark, Luxembourg, and New Zealand either ban or severely limit handgun ownership." <u>McDonald</u>, *supra*, 561 U.S. at 781. While <u>McDonald</u> found that point irrelevant as to the States, is highly relevant as to the CNMI,[48] since the whole "Anglo-American" fundamental-rights analysis of <u>Duncan v. Louisiana</u>, 391 U.S. 145 (1968), which the <u>McDonald</u> court relies on so heavily, *see* 561 U.S. at 764, was repudiated for the CNMI by this Court in favor of the Insular Cases rule that only those rights "fundamental in the international sense," *i.e.*, "fundamental to all free government" (including non-Anglo-American) are automatically applicable. *See* <u>Atalig</u>, *supra*, 723 F.2d at 689-90.

## CONCLUSION

<u>Heller</u> and <u>McDonald</u> were devoted to ascertaining the intent of the framers and ratifiers of the Second and Fourteenth Amendments with respect to the right to bear arms. This case should likewise be devoted to ascertaining the intent of the framers and ratifiers of the Covenant. These were different people, acting at a different place and time. It necessarily

---

[48] *Cf.* <u>Rayphand</u>, *supra*, 95 F.Supp. 2d at 1140 ("Several countries that are considered to have 'free government' have a bicameral legislative in which one house is malapportioned.").

follows that they may well have had a different intent. In other words, it may be conceded *arguendo* that <u>Heller</u> accurately discerned and declared the intent of the framers and ratifiers of the Second Amendment in 1791, and that <u>McDonald</u> accurately discerned and declared the intent of the framers and ratifiers of the Fourteenth Amendment in 1868. Even so, neither answers the question of what the framers and ratifiers of the Covenant intended in 1975, leaving that a question that must be determined independently.

For the reasons set forth herein, the district court determined it wrongly, and its judgment must therefore be reversed.

Respectfully submitted this 17th day of October, 2014.

O'CONNOR BERMAN DOTTS & BANES
Attorneys for Appellant


*/s/ Joseph E. Horey*
By:_____
Joseph E. Horey


## <u>STATEMENT OF RELATED CASES</u>

Appellant is aware of one related case pending before the Court, to wit: <u>Davis v. Commonwealth Election Commission</u>, 9th Cir. App. No. 14-16090.

*1000-09-161010-appellant's brief*

## CERTIFICATION PURSUANT TO RULE 32(a)(7)(C)

Pursuant to Ninth Circuit Rule 32(a)(7)(C), I certify that Appellant's Opening Brief is proportionately spaced, has a typeface of 14 points and contains 9,641 words.

Dated this 17th day of October, 2016.

O'CONNOR BERMAN DOTTS & BANES
Attorneys for Appellant


By: /s/ *Joseph E. Horey*_____
    Joseph E. Horey

**ADDENDUM**
**TABLE OF CONTENTS**

CNMI Public Law 19-42 ("SAFE Act")                1

CNMI House Resolution 19-44                        57

**Public Law No. 19-42**



## THE SENATE
NINETEENTH NORTHERN MARIANAS COMMONWEALTH LEGISLATURE

**SECOND EMERGENCY SESSION, 2016**          **S. B.  NO. 19-94, SD1, HD10**

### AN ACT

To regulate the possession of firearms in the Commonwealth.

**BE IT ENACTED BY THE NINETEENTH NORTHERN MARIANAS COMMONWEALTH LEGISLATURE:**

1  **Section 1. <u>Short Title</u>.** This Act may be cited to as the SAFE Act (Special Act for

2  Firearms Enforcement).

3  **Section 2. <u>Findings and Purpose</u>.** The Legislature finds that human life is the

4  most precious thing in the entire world. The Legislature finds that providing safety and the

5  protection of human life to be the highest duty of government. The Legislature finds that

6  the current firearms laws, which ban handguns, rifles in calibers larger than .223, and

7  shotguns with a bore diameter of .410, protect human life and ensure public safety by

8  outlawing firearms whose primary purpose is offense against human beings. The

9  Legislature finds that the culture of the Commonwealth of the Northern Mariana Islands is

10  peaceful. The Legislature further finds that the history of the Commonwealth demonstrates

11  that offensive firearms have never been needed by the community, and the use of offensive

12  firearms during World War II only brought suffering on an almost unimaginable scale to

13  the people of the Northern Mariana Islands. Finally, the Legislature finds that the vast

14  majority of the inhabitants of the Commonwealth strongly oppose the legalization of

1  handguns because they rightly fear that the largescale introduction of handguns will

2  undermine our peaceful communities.

3  Unfortunately, the current firearms laws of the Commonwealth, and the People's

4  desire to prevent the introduction of handguns into our communities, are at odds with the

5  Second Amendment to the United States Constitution. The Legislature recognizes its

6  solemn duty to uphold and protect the United States and Commonwealth Constitutions.

7  Therefore, the Legislature reluctantly accepts that it must legalize the ownership and

8  possession of firearms to the extent required by the Second Amendment. The Legislature is

9  therefore passing the Special Act for Firearms Enforcement (SAFE) to create a framework

10  for firearms ownership, possession, and use that complies with the Second Amendment

11  while affording the greatest possible degree of protection to the people of the

12  Commonwealth and its guests.

13  On June 26, 2008, the Supreme Court of the United States held in *District of*

14  *Columbia v. Heller*, that the Second Amendment protects the individual right to possess a

15  firearm within the home.

16  On June 28, 2010, the Supreme Court of the United States held in *McDonald v.*

17  *Chicago* that the Second Amendment was incorporated under the Fourteenth Amendment,

18  and therefore, the Second Amendment applies to all state and local governments.

19  Article 5, Section 501 of the Covenant makes the Second Amendment applicable to

20  the Commonwealth as if the Commonwealth were one of the several States. It is true that

21  the Sixth Amendment right to trial by jury has been applied to the Commonwealth

22  differently than it has been applied to the states, but the Covenant specifically provides that

**Public Law No. 19-42**

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

1   the Sixth Amendment right to trial by jury is not applicable in the Commonwealth. There

2   is no such exception in the Covenant for the application of the Second Amendment.

3       Unfortunately, the Commonwealth Weapons Control Act was challenged in the

4   United States District Court for the Northern Marianas Islands. The Commonwealth was

5   engaged in two difficult lawsuits, which were admirably and tirelessly fought by the Office

6   of the Attorney General. Unfortunately, on March 28, 2016, the United States District

7   Court for the District of the Northern Mariana Islands held that the Second Amendment

8   applies to the Commonwealth. The Legislature therefore finds that it is in the best interest

9   of the Commonwealth to update the Commonwealth's gun control laws to meet this new

10   reality.

11       The Legislature finds that ensuring public safety and preserving human life are

12   important and compelling government interests of the highest order. The introduction of

13   handguns threatens this public safety, especially since the Department of Public Safety

14   does not have adequate body armor for all its officers, and does not have the funds to

15   procure sufficient body armor to protect its officers. The Legislature agrees with the

16   findings of the city council District of Columbia and the city council of the City of

17   Highland Park, Illinois that assault weapons are disproportionately used in the commission

18   of crimes such as the mass shootings at schools, shopping malls, clinics, and places of

19   worship, that have plagued our nation, and should not be allowed in the Commonwealth.

20   The Legislature agrees with the legislative histories of the statutes involved in *Friedman v.*

21   *City of Highland Park, Illinois*, 784 F.3d 406, 408 (7th Cir.), *cert. denied sub nom.*

22   *Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447 (2015), *Heller v. District of*

Page 3

**SENATE BILL NO. 19-94, SD1, HD10**

1  *Columbia*, 801 F.3d 264, 268 (D.C. Cir. 2015), and *Heller v. District of Columbia*, 670

2  F.3d 1244, 1248 (D.C. Cir. 2011), and adopts those opinions and the legislative histories of

3  those acts.

4      The Legislature further finds that the unregulated keeping of firearms in the home

5  endangers the lives and safety of minor children. The Legislature agrees with the City of

6  San Francisco and the United States Court of Appeals for the Ninth Circuit in *Jackson v.*

7  *City & Cty. of San Francisco*, 746 F.3d 953, 958 (9th Cir. 2014) *cert. denied*, 135 S. Ct.

8  2799, 192 L. Ed. 2d 865 (2015), that requiring firearms to be either kept on the person of

9  an individual over 18 or secured with a trigger lock in a gun safe furthers the important

10  interest in public safety and satisfies intermediate scrutiny. The Legislature adopts the City

11  of San Francisco's legislative history and the Court's opinion in the *Jackson* case.

12      The Legislature further finds that crimes must be created to address the expected

13  increase in firearm violence if the Second Amendment applies to the Commonwealth.

14      The Legislature further finds that ensuring public safety for residents and tourists,

15  is an important and compelling government interest. The Legislature finds that

16  comprehensive regulation of firearms substantially advances that compelling and important

17  governmental interest, and that the means employed in this legislation are narrowly

18  tailored and the least restrictive means of achieving that public interest. Therefore, the

19  Legislature finds that it is in the best interests of the Commonwealth to enact

20  comprehensive legislation for the regulation and control of firearms and ammunition in the

21  Commonwealth.

1  Finally, the Legislature finds that the *Section-By-Section Analysis of the "Special*

2  *Act for Firearm Enforcement (SAFE)"* represents and explains the Legislature's intent

3  regarding SAFE. The Legislature therefore incorporates the *Section-By-Section Analysis of*

4  *the "Special Act for Firearm Enforcement (SAFE)"* into these Findings by reference. The

5  Legislature intends for the *Section-By-Section Analysis of the "Special Act for Firearm*

6  *Enforcement (SAFE)"* to have the same degree of persuasive authority as the *Analysis of*

7  *the Constitution of the Northern Mariana Islands* and the *Section-By-Section Analysis of*

8  *the Covenant to Establish a Commonwealth of the Northern Mariana Islands* have on the

9  interpretation of the Constitution and Covenant.

10  **Section 3. <u>Repealer</u>**. The following provisions of the Commonwealth Code are

11  hereby repealed: 6 CMC §§ 102(a), (k), (l), (m), (q); 6 CMC § 103(n); 6 CMC § 2222(e);

12  6 CMC § 2206; 6 CMC § 2273; 6 CMC §§ 2301(a)(3)–(4).

13  **Section 4. <u>Amendment</u>**. Subject to codification by the Law Revision

14  Commission, Title 6 of the Commonwealth Code is amended to establish a **Division 10**,

15  which shall be titled "**Special Act for Firearms Enforcement (SAFE).**"

16  **Section 5. <u>Amendment</u>**. Subject to codification by the Law Revision

17  Commission, Title 6, Division 10 of the Commonwealth Code is amended by adding

18  Chapter 1, entitled "Definitions" which shall read as follows:

19  "**Chapter 1. Definitions.**

20  **§ 101. Definitions.** For purposes of this Division:

21  (a)  "Addicted to narcotics" means a person who has been:

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

(1)      convicted of an offense involving the use or possession of cannabis, a controlled substance, or methamphetamine within the past year; or

(2)      determined by the Department of Public Safety to be addicted to narcotics based upon federal law or federal guidelines. "Addicted to narcotics" does not include possession or use of a prescribed controlled substance under the direction and authority of a physician or other person authorized to prescribe the controlled substance when the controlled substance is used in the prescribed manner.

(b)      "Adjudicated as a mentally disabled person" means the person has been the subject of a determination by a court, board, commission or other lawful authority that the person, as a result of marked subnormal intelligence, or mental illness, mental impairment, incompetency, condition, or disease:

(1)      presents a clear and present danger to himself, herself, or to others;

(2)      lacks the mental capacity to manage his or her own affairs;

(3)      is not guilty in a criminal case by reason of insanity, mental disease or defect;

(4)      is incompetent to stand trial in a criminal case;

(5)      is not guilty by reason of lack of mental responsibility under any Article of the Uniform Code of Military Justice;

SENATE BILL NO. 19-94, SD1, HD10

1          (6)    is subject to involuntary commitment under the Involuntary

2                Commitment Act.

3   (c)   "Ammunition" means cartridge cases, shells, projectiles (including shot),

4      primers, bullets (including restricted pistol bullets), propellant powder, or other

5      devices or materials designed, redesigned, or intended for use in a firearm or

6      destructive device.

7   (d)   "Antique firearm" means:

8          (1)    Any firearm (including any firearm with a matchlock,

9                flintlock, percussion cap, or similar type of ignition system)

10               manufactured in or before 1898; and

11         (2)    Any replica of any firearm described in subparagraph (e)(1),

12               if such replica:

13               (A) Is not designed or redesigned for using rim-fire or

14                   conventional center-fire fixed ammunition; or

15               (B) Uses rim-fire or conventional ammunition which is

16                   no longer manufactured in the United States and

17                   which is not readily available in the ordinary

18                   channels of commercial trade.

19   (e)   "Assault weapon" means:

20         (1)    The following semiautomatic firearms:

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

1        (C) A semiautomatic rifle in a caliber greater than .223

2             that has the capacity to accept a detachable magazine

3             and any one of the following:

4     i.    A pistol grip that protrudes conspicuously beneath

5          the action of the weapon;

6    ii.    A thumbhole stock;

7    iii.    A folding or telescoping stock;

8    iv.    A grenade launcher or flare launcher;

9    v.    A flash suppressor; or

10    vi.    A forward pistol grip;

11     (D) A semiautomatic pistol that has the capacity to accept

12          a detachable magazine and any one of the following:

13    vii.    A threaded barrel, capable of accepting a flash

14          suppressor, forward handgrip, or silencer, sound

15          suppressor or sound moderator;

16    viii.    A second handgrip;

17    ix.    A shroud that is attached to, or partially or

18          completely encircles, the barrel that allows the bearer

19          to fire the weapon without burning his or her hand,

20          except a slide that encloses the barrel; or

21    x.    The capacity to accept a detachable magazine at some

22          location outside of the pistol grip;

SENATE BILL NO. 19-94, SD1, HD10

       (E) A semiautomatic shotgun that has one or more of the following:

        xi.    A folding or telescoping stock;

        xii.   A pistol grip that protrudes conspicuously beneath the action of the weapon;

        xiii.  A thumbhole stock; or

        xiv.  A vertical handgrip; and

        xv.   A semiautomatic shotgun that has the ability to accept a detachable magazine; and

       (F) Any shotgun with a revolving cylinder; provided, that this sub-subparagraph shall not apply to a weapon with an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition; and

       (G) Any firearm that the Department of Public Safety may designate as an assault weapon by rule, based on a determination that the firearm would reasonably pose the same or similar danger to the health, safety, and security of the residents of the Commonwealth as those weapons enumerated in this paragraph.

(2)    The term "assault weapon" shall not include:

       (H) Any antique firearm; or

SENATE BILL NO. 19-94, SD1, HD10

(I) Any weapon exempted by the Department of Public Safety, by rule, that would otherwise fall within the definition of "assault weapon" pursuant to this section from being classified as an assault weapon.

(f) "Clear and present danger" means a person who:

(1) communicates a serious threat of physical violence against a reasonably identifiable victim or poses a clear and imminent risk of serious physical injury to himself, herself, or another person as determined by a physician, clinical psychologist, or qualified examiner; or

(2) demonstrates threatening physical or verbal behavior, such as violent, suicidal, or assaultive threats, actions, or other behavior, as determined by a physician, clinical psychologist, qualified examiner, school administrator, or law enforcement official.

(g) "Concealed firearm" means a loaded or unloaded pistol carried on or about a person completely or mostly concealed from view of the public on or about a person or within a vehicle.

(h) "Controlled substance" means a controlled substance or controlled substance analog as defined by 6 CMC § 2102(c).

(i) "Container" shall mean a secure container which is fully enclosed and locked with a padlock, key lock, combination lock, or similar locking device and that

SENATE BILL NO. <u>19-94, SD1, HD10</u>

1        meets the standards, specifications, and regulations established and approved by

2        the Commissioner of the Department of Public Safety."

3    (j)    "Counterfeit" means to copy or imitate, without legal authority, with intent to

4        deceive.

5    (k)    "Courthouse" means a building occupied by judicial courts and containing

6        rooms in which judicial proceedings are held.

7    (l)    "Dangerous device" means any device, switch or gravity blade knife, blackjack,

8        sandbag, metal, wooden or shark's tooth knuckles, dagger, any instrument

9        designed or redesigned for use as a weapon, or any other instrument which can

10       be used for the purpose of inflicting bodily harm and which under the

11       circumstances of its possession serves no lawful purpose.

12   (m)    "Department" means the Department of Public Safety.

13   (n)    "Destructive device" means:

14           (1)    An explosive, incendiary, or poison gas bomb, grenade,

15                rocket, missile, mine, or similar device;

16           (2)    Any device by whatever name known which will, or is

17                designed or redesigned, or may be readily converted or

18                restored to expel a projectile by the action of an explosive or

19                other propellant through a smooth bore barrel, except a

20                shotgun and antique weapons;

21           (3)    Any device containing tear gas or a chemically similar

22                lacrimator or sternutator by whatever name known;

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

(4)    Any combination of parts designed or intended for use in converting any device into any destructive device; or from which a destructive device may be readily assembled; provided, that the term shall not include:

(J) Any pneumatic, spring, or B-B gun which expels a single projectile not exceeding 8 mm in diameter;

(K) Any device which is neither designed nor redesigned for use as a weapon;

(L) Any device originally a weapon which has been redesigned for use as a signaling, line throwing, or safety device; or

(M)    Any device which the Department of Public Safety finds is not likely to be used as a weapon.

(o)    "Developmentally disabled" means a disability which is attributable to any other condition which results in impairment similar to that caused by an intellectual disability and which requires services similar to those required by intellectually disabled persons. The disability must originate before the age of 18 years, be expected to continue indefinitely, and constitute a substantial handicap. This disability results in the professional opinion of a physician, clinical psychologist, or qualified examiner, in significant functional limitations in three or more of the following areas of major life activity:

(1)    self-care;

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

1          (2)     receptive and expressive language;

2          (3)     learning;

3          (4)     mobility; or

4          (5)     self-direction.

5    (p)    "Federally licensed firearm dealer" means a person who is licensed as a federal

6          firearms dealer under Section 923 of the Federal Gun Control Act of 1968 (18

7          U.S.C. § 923).

8    (q)    "Firearm" means any weapon, regardless of operability, which will, or is

9          designed or redesigned, made or remade, readily converted, restored, or

10         repaired, or is intended to, expel a projectile or projectiles by the action of an

11         explosive; the frame or receiver of any such device; or any firearm muffler or

12         silencer; provided, that such term shall not include:

13          (1)     Destructive devices;

14          (2)     Any device used exclusively for firing explosive rivets, stud

15                     cartridges, or similar industrial ammunition and incapable for

16                     use as a weapon.

17          (3)     any pneumatic gun, spring gun, paint ball gun, or B-B gun

18                     which expels a single projectile not exceeding 8mm in

19                     diameter or which has a maximum muzzle velocity of less

20                     than 700 feet per second;

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

1          (4)    any pneumatic gun, spring gun, paint ball gun, or B-B gun

2                  which expels breakable paint balls containing washable

3                  marking colors;

4          (5)    any device used exclusively for signaling or safety and

5                  required or recommended by the United States Coast Guard

6                  or the Interstate Commerce Commission;

7          (6)    an antique firearm (other than a machine-gun) which,

8                  although designed as a weapon, the Department of Public

9                  Safety finds by reason of the date of its manufacture, value,

10                 design, and other characteristics is primarily a collector's item

11                 and is not likely to be used as a weapon.

12   (r)    "Firearm ammunition" means any self-contained cartridge or shotgun shell, by

13       whatever name known, which is designed to be used or adaptable to use in a

14       firearm; excluding, however:

15         (1)    any ammunition exclusively designed for use with a device

16                 used exclusively for signaling or safety and required or

17                 recommended by the United States Coast Guard or the

18                 Interstate Commerce Commission; and

19         (2)    any ammunition designed exclusively for use with a stud or

20                 rivet driver or other similar industrial ammunition.

21   (s)    "Government building" means:

22         (1)    The building in which a government entity is housed;

(2)     The building where a government entity meets in its official capacity; provided, however, that if such building is not a publicly owned building, such building shall be considered a government building for the purposes of this Code section only during the time such government entity is meeting at such building; or

(3)     The portion of any building that is not a publicly owned building that is occupied by a government entity.

(t)     "Government entity" means an office, agency, authority, department, commission, board, body, division, instrumentality, or institution of the state or any county, municipal corporation, consolidated government, or local board of education within this state.

(u)     "Intellectually disabled" means significantly subaverage general intellectual functioning which exists concurrently with impairment in adaptive behavior and which originates before the age of 18 years.

(v)     "Involuntarily admitted" has the meaning as prescribed in the Involuntary Commitment Act, 6 CMC §§ 6601-6612.

(w)     "Law Enforcement" means:

(1)     any police officer employed by the Department of Public Safety;

(2)     Any judge, justice, judge pro tem, justice pro tem, administrative hearing officer, or administrative law judge;

SENATE BILL NO. <u>19-94, SD1, HD10</u>

(3)    any correctional officer employed by the Department of Corrections;

(4)    any parole officer employed by the Board of Parole;

(5)    any investigator employed by the Homeland Security and Emergency Management Office;

(6)    any probation officer employed by the Office of Adult Probation;

(7)    any customs officer employed by the Department of Finance;

(8)    any marshal employed by the Commonwealth Judiciary;

(9)    any conservation officer employed by the Department of Fish and Wildlife;

(10)    any enforcement officer employed by the Commonwealth Ports Authority;

(11)    The Sergeant of Arms of the House of Representatives;

(12)    The Sergeant of Arms of the Senate;

(13)    the Public Auditor;

(14)    any attorney employed by the Office of the Public Auditor and designated as law enforcement by the Public Auditor;

(15)    any investigator or attorney employed by the Office of the Public Auditor;

(16)    the Attorney General;

SENATE BILL NO. <u>19-94, SD1, HD10</u>

(17)    any Assistant Attorney General designated as law enforcement by the Attorney General;

(18)    any investigator employed by the Office of the Attorney General Investigation Division;

(19)    any person deputized by the Commissioner of the Department of Public Safety;

(x)    "Machine gun" means any firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot or bullet, without manual reloading, by a single function of the trigger. The term "machine gun" shall also include the frame or receiver of any such firearm, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a firearm into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

(y)    "Mental health facility" means any licensed private hospital or hospital affiliate, institution, or facility, or part thereof, and any facility, or part thereof, operated by the Commonwealth or a political subdivision thereof which provide treatment of persons with mental illness and includes all hospitals, institutions, clinics, evaluation facilities, mental health centers, colleges, universities, long-term care facilities, and nursing homes, or parts thereof, which provide treatment of persons with mental illness whether or not the primary purpose is to provide treatment of persons with mental illness.

SENATE BILL NO. <u>19-94, SD1, HD10</u>

(z) "Organization" means any partnership, company, corporation, or other business entity, or any group or association of 2 or more persons united for a common purpose.

(aa) "Patient" means:

    (1) a person who voluntarily receives mental health treatment as an in-patient or resident of any public or private mental health facility, unless the treatment was solely for an alcohol abuse disorder and no other secondary substance abuse disorder or mental illness; or

    (2) a person who voluntarily receives mental health treatment as an out-patient or is provided services by a public or private mental health facility, and who poses a clear and present danger to himself, herself, or to others.

(bb) "Pistol" means any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length.

(cc) "Place of business" means a business that is located in an immovable structure at a fixed location and that is operated and owned entirely, or in substantial part, by the firearm registrant.

(dd) "Place of worship" means a building, structure, or place used primarily for religious worship, including, but not limited to, churches, synagogues, mosques, temples, shrines, monasteries, and convents, and includes the grounds of a place of worship.

**SENATE BILL NO. 19-94, SD1, HD10**

(ee) "Registration certificate" means a certificate validly issued pursuant to this Commonwealth law evincing the registration of a firearm.

(ff) "Resident" means any person that has physically resided in the Commonwealth lawfully for a minimum of thirty (30) days and that intends to reside in the Commonwealth for an unlimited or indefinite period.

(gg) "Restricted pistol bullet" or "Restricted bullet" means:

    (1) A projectile or projectile core which may be used in a pistol and which is constructed entirely (excluding the presence of traces of other substances) from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium;

    (2) A full jacketed projectile larger than .22 caliber designed and intended for use in a pistol and whose jacket has a weight of more than 25% of the total weight of the projectile; or

    (3) Ammunition for a .50 BMG rifle.

(hh) "Restricted pistol bullet" does not include:

    (1) Shotgun shot required by federal or state environmental or game regulations for hunting purposes;

    (2) A frangible projectile designed for target shooting;

    (3) A projectile which the Attorney General of the United States or the Department of Public Safety finds is primarily intended to be used for sporting purposes; or

Page 19

019

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

(4)     Any other projectile or projectile core which the Attorney General of the United States or the Department of Public Safety finds is intended to be used for industrial purposes, including a charge used in an oil and gas well perforating device.

(ii)   "Rifle" means a grooved bore firearm using a fixed metallic cartridge with a single projectile and designed or redesigned, made or remade, and intended to be fired from the shoulder.

(jj)   "Sawed-off shotgun" means a shotgun having a barrel of less than 18 inches in length; or a firearm made from a shotgun if such firearm as modified has an overall length of less than 26 inches or any barrel of less than 18 inches in length.

(kk)   "Semiautomatic weapon" means a weapon of any description irrespective of size, by whatever name designated or known, loaded or unloaded, from which may be repeatedly or automatically discharged a number of bullets contained in a magazine, ribbon or other receptacle by a like number of movements of the trigger or firing mechanism without recocking or resetting the trigger or firing mechanism.

(ll)   "Shotgun" means a smooth bore firearm using a fixed shotgun shell with either a number of ball shot or a single projectile, and designed or redesigned, made or remade, and intended to be fired from the shoulder.

(mm)   "Short barreled rifle" means a rifle having any barrel less than 16 inches in length, or a firearm made from a rifle if such firearm as modified has an overall length of less than 26 inches or any barrel of less than 16 inches.

(nn)   "Vendor's license" means a license to buy or sell, repair, trade, or otherwise deal in firearms, destructive devices, or ammunition as provided for by Commonwealth law."

**Section 6. <u>Amendment</u>.** Subject to codification by the Law Revision Commission, Title 6, Division 10 of the Commonwealth Code is amended by adding Chapter 2, which shall read as follows:

**"Chapter 2. Possession, Storage, & Transportation of Firearms.**

**§ 201. Security mortgages, deposits, or pawns with firearms, destructive devices, or ammunition prohibited; loan or rental of firearms, destructive devices, or ammunition prohibited.**

(a)   No firearm, dangerous device, destructive device, or ammunition shall be security for, or be taken or received by way of any mortgage, deposit, pledge, or pawn.

(b)   No person or organization may loan, borrow, give, or rent to or from another person or organization, any firearm, dangerous device, destructive device, or ammunition.

(c)   Any person convicted of a violation of this section shall be fined not more than one thousand dollars or imprisoned for not more than 1 year, or both.

**§ 202. Allowing an Unsupervised Minor Use or Possess a Firearm.**

**SENATE BILL NO. 19-94, SD1, HD10**

(a)      Any person who allows a minor, defined as any person under 21 years of age, to use or possess a firearm without adult supervision shall be guilty of a misdemeanor punishable by a fine of not more than one thousand dollars and 180 days imprisonment, or both.

**§ 203. Sale of Firearms, Destructive Devices, Dangerous Devices, or Ammunition to Persons Under 21 Years of Age Prohibited.**

(a)      A person who knowingly or intentionally sells, transfers, or distributes a firearm, dangerous device, destructive device, or ammunition to a person under 21 years of age shall be fined not more than $25,000 or imprisoned for not more than 10 years, or both.

**§ 204. Storage of firearms; penalties.**

(a)      No person shall keep a firearm within a residence owned or controlled by that person unless:

         (1)      the firearm is stored in a locked container or disabled with a trigger lock; or

         (2)      the firearm is carried on the person of an individual over the age of 21; or

         (3)      the firearm is under the immediate control of a person who is a law enforcement officer.

(b)      A person who violates the foregoing subsection (a) of this section is guilty of criminally negligent storage of a firearm and, except as otherwise provided in

SENATE BILL NO. <u>19-94, SD1, HD10</u>

1   this section, shall be fined not more than $1,000, imprisoned not more than 180

2   days, or both.

3   (c)   A person who violates subsection (a) of this section, and as a result, a minor

4        causes injury or death to himself or another with the firearm, shall be fined not

5        more than $5,000, or imprisoned not more than 5 years, or both.

6   (d)   The provisions of this section shall not apply if the minor obtains the firearm as

7        a result of an unlawful entry or burglary to any premises by any person.

8   (e)   For the purposes of this section, the term "minor" shall mean a person under the

9        age of 21 years.

10  (f)   This section shall not apply to a properly registered firearm on the effective

11       date of this Act until ninety days after this Act becomes law.

12  **§ 205. Authority to carry firearms in certain places and for certain purposes.**

13  (a)   A person may not carry a firearm, except as provided by this Division or

14       Commonwealth law.

15  (b)   A person lawfully in possession of a firearm may carry the firearm:

16       (1)   Within the registrant's home or on land belonging to the

17            registrant;

18       (2)   On the land or in the legal dwelling of another person as an

19            invitee with that person's permission;

20       (3)   While it is being used for lawful sporting purposes, such as

21            target practice at a shooting range or shooting gallery;

**SENATE BILL NO. 19-94, SD1, HD10**

(4)    While it is being used for lawful hunting, fishing, or trapping purposes with a license or permit while engaged in hunting, trapping or fishing;

(5)    While it is kept at the registrant's place of business; or

(6)    While it is being transported for a lawful purpose as expressly authorized by § 206 of this Chapter or federal law and in accordance with the requirements of said law.

(c)    A violation of this section shall be punished by a fine of not more than $2,500 or imprisonment for not more than 1 year, or both.

### § 206. Lawful transportation of firearms.

(a)    Any person who is not otherwise prohibited by the law from transporting, shipping, or receiving a firearm shall be permitted to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry the firearm to any other place where he may lawfully possess and carry the firearm if the firearm is transported in accordance with this section.

(b)

(1)    If the transportation of the firearm is by a vehicle, the firearm shall be unloaded, and neither the firearm nor any ammunition being transported shall be readily accessible or directly accessible from the passenger compartment of the transporting vehicle.

(2) If the transporting vehicle does not have a compartment separate from the passenger compartment, the firearm or ammunition shall be contained in a locked container other than the glove compartment or console, and the firearm shall be unloaded.

(c) If the transportation of the firearm is in a manner other than in a vehicle, the firearm shall be:

(1) Unloaded;

(2) Inside a locked container; and

(3) Separate from any ammunition.

(d) It shall be a felony punishable by a fine of not more than $10,000 or imprisonment for not more than 10 years, or both, for any person to knowingly transport a firearm in violation of this section.

### § 207. Persons Permitted to Possess Ammunition

(a) No person shall possess ammunition in the Commonwealth unless:

(1) He or she is a licensed firearm vendor;

(2) He or she is the holder of the valid registration certificate for a firearm of the same gauge or caliber as the ammunition he possesses; except, that no such person shall possess one or more restricted bullets; or

**Public Law No. 19-42**

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

(3) He or she temporarily possesses ammunition while participating in a firearms training and safety class conducted by a firearms instructor.

(b) No person in the Commonwealth shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

(c) Penalties.

(1) any person convicted of a violation of subsection (a) of this section for legally allowable ammunition shall be fined not more than the amount set forth in $2,500.00 or imprisoned for not more than 1 year, or both.

(2) A person convicted of possessing more than one restricted pistol bullet in violation of subsection (a)(2) of this section may be sentenced to imprisonment for a term not to exceed 10 years, and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 1 year and shall

Page 26

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

1     not be released from prison or granted probation or

2     suspension of sentence prior to serving the mandatory-

3     minimum sentence, and, in addition, may be fined not more

4     than $25,000.

5     (3)    A person convicted of possessing a single restricted pistol

6     bullet in violation of subsection (a)(2) of this section shall be

7     fined not more than the amount set forth in $2,500.00 or

8     imprisoned for not more than 1 year, or both.

9     (4)    A person convicted of possessing a large capacity

10     ammunition feeding device in violation of subsection (b) of

11     this section may be sentenced to imprisonment for a term not

12     to exceed 10 years, and shall be sentenced to imprisonment

13     for a mandatory-minimum term of not less than 1 year and

14     shall not be released from prison or granted probation or

15     suspension of sentence prior to serving the mandatory-

16     minimum sentence, and, in addition, may be fined not more

17     than $25,000. This section shall not apply to any large

18     capacity ammunition feeding device possessed by the owner

19     of a properly registered firearm capable of receiving such a

20     device until ninety days after this Act becomes law.

21     **§ 208. Prohibited Firearms.**

22     (a)    No person shall possess:

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

(1) Sawed-off shotgun;

(2) A silencer, sound suppressor or sound moderator;

(2) Machine gun;

(4) Short-barreled rifle;

(5) An assault weapon;

(6) A rifle other than a .22 caliber rimfire, .22 caliber center-fire and .223 caliber center-fire: or

(7) A shotgun other than a .410 gauge.

(b)     Whoever violates this section shall be punished by a fine of not more $2,500 or imprisonment for not more than 1 year, or both. However, if the violation occurs after such person has been convicted in the Commonwealth of a violation of this Division, or of a felony, either in the Commonwealth or in another jurisdiction, in which case such person shall be imprisoned for not more than 10 years, and may be fined not more than $25,000.

**§ 209. Voluntary surrender of firearms, destructive devices, or ammunition; immunity from prosecution; determination of evidentiary value of firearm.**

(a)     If a person or organization within the Commonwealth voluntarily and peaceably delivers and abandons to the Department of Public Safety any firearm, destructive device or ammunition at any time, such delivery shall preclude the arrest and prosecution of such person on a charge of violating any provision of this Division with respect to the firearm, destructive device, or ammunition voluntarily delivered. Delivery under this section may be made at

any police station or by summoning a police officer to the person's residence or place of business. Every firearm and destructive device to be delivered and abandoned to the Chief under this section shall be transported in accordance with § 206 of this chapter and, in the case of delivery to a police facility, the package shall be carried in open view.

(b)　No person who delivers and abandons a firearm, destructive device, or ammunition in full compliance with this section, shall be required to furnish identification, photographs, or fingerprints.

(c)　Whenever any firearm, destructive device, or any ammunition is surrendered under this section, the Department of Public Safety shall inspect the firearm and determine if it is needed as evidence in a Commonwealth or federal case; provided, that if the same is not needed as evidence, it shall be destroyed.

**§ 210. Self Defense with Deadly Force.**

(a) An individual is allowed to use a firearm or deadly force in self-defense if:

(1) The individual is protecting him or herself and the use of the firearm or deadly force would reasonably prevent the immediate use of force by an aggressor. Provided further that this use is based upon the reasonable belief that the aggressor is about to inflict an intentional contact that would or could reasonably result in serious bodily harm or death; and the use of force by the aggressor can safely be prevented only by the immediate use of deadly force.

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

1      (b) An individual is allowed to use a firearm or deadly force in self-defense

2    of a third party if:

3          (1) The individual is protecting a third party and the use of the

4    firearm or deadly force would reasonably prevent the immediate use of

5    force by an aggressor.  Provided further that this use is based upon the

6    reasonable belief that the aggressor is about to inflict an intentional contact

7    that would or could reasonably result in serious bodily harm or death; and

8    the use of force by the aggressor can safely be prevented only by the

9    immediate use of deadly force.

10    (c) The right to use deadly force for self defense or defense of a third person

11    does not exist if the individual correctly or reasonably believes that he or she, or the

12    third party in the case of self defense of a third party, can with complete safety

13    avoid the necessity of so defending himself by

14          (1)    retreating if attacked in any place other than his dwelling

15                  place, or in a place which is also the dwelling of the other, or

16          (2)    relinquishing the exercise of any right or privilege other than

17                  his privilege to prevent intrusion upon or dispossession of his

18                  dwelling place.

19        (d)    An individual loses the right to self-defense with a firearm if he or

20    she is the initial aggressor or intentionally provoked the aggressor by word or deed

21    that is reasonably calculated to elicit a violent response from a reasonable person or

22    the individual aggressor.

§ 211. Exemptions.

(a)     The provisions of this Division regarding the possession of firearms and firearm ammunition shall not apply to:

    (1)     United States Marshals, while engaged in the operation of their official duties;

    (2)     Members of the Armed Forces of the United States or the National Guard, while engaged in the operation of their official duties;

    (3)     The Department of Public Safety and any Commonwealth agency that regularly employs members of law enforcement;

    (4)     Members of law enforcement, while engaged in the operation of their official duties;

    (5)     Federal officials required to carry firearms, while engaged in the operation of their official duties."

Section 7. Amendment. Subject to codification by the Law Revision Commission, Title 6, Division 10 of the Commonwealth Code is amended by adding Chapter 3, which shall read as follows:

"Chapter 3. Weapon Specific Crimes.

§ 301. Unlawful discharge of firearm.

(a)     Except as otherwise permitted by law, including legitimate self-defense, no firearm shall be discharged or set off in the Commonwealth without a special

**SENATE BILL NO. 19-94, SD1, HD10**

1   written permit from the Department of Public Safety issued pursuant to
2   Department regulations.

3   (b)   No person shall discharge a firearm as an act of celebration.

4   (c)   The discharge of a firearm by a property owner on his or her private property
5         for the sole purpose of slaughtering livestock shall be considered lawful,
6         provided that the firearm is discharged on a farm outside of villages and/or
7         areas zoned as residential.

8   (d)   Violation of this section shall be punishable by a fine of not more than $5,000 a
9         term of imprisonment for not more than five years, or both.

10  **§ 302. Possession or use of weapons while under the influence.**

11  (a)   No person shall carry a firearm, dangerous device, or destructive device while
12        under the influence of any amount of alcohol, drugs, intoxicating compounds or
13        combination of compounds, or any combination thereof.

14  (b)   A violation of this section shall be punishable by a fine of not more than a
15        $1,000 or not more than one year imprisonment, or both.

16  **§ 303. Possession of weapon while disguised.**

17  (a)   A person commits the offense of unlawful use of weapons while disguised
18        when he knowingly carries or possesses in a vehicle or on or about his person
19        any pistol, revolver, firearm, dangerous device, destructive device, or any
20        counterfeit version of the foregoing, when he or she is hooded, robed or masked
21        in such manner as to conceal his or her identity in furtherance of the
22        commission or attempted commission of a violation of Commonwealth law.

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

(b)     A violation of this section shall be punishable by a fine of not more than a $1,000 or not more than one year imprisonment, or both.

### § 304. Theft of a Firearm.

(a)     A person commits the offense of theft of a firearm if he or she unlawfully takes, or exercises control over, a firearm or firearms of another with intent to permanently deprive the owner of his or her rights to the firearm.

(b)     Theft of a firearm includes any action that would be a violation of 6 CMC §§ 1601–1605, or any other provision of Commonwealth law outlawing or defining theft, if the property unlawfully taken is a firearm.

(c)     Each firearm taken in the theft under this section is a separate offense.

(d)     Upon conviction of a violation of this section, the person shall be fined not more than $10,000 and shall be sentenced to a term of imprisonment not to exceed 15 years and a mandatory-minimum term of not less than 5 years and shall not be released on parole prior to serving the mandatory-minimum sentence.

### § 305. Possession of stolen firearm; penalty.

(a)     A person commits possession of a stolen firearm when he or she, not being entitled to the possession of a firearm, possesses the firearm, knowing it to have been stolen or converted. The trier of fact may infer that a person who possesses a firearm with knowledge that its serial number has been removed or altered has knowledge that the firearm is stolen or converted.

Public Law No. 19-42

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

(b)     Upon conviction of a violation of this section, the person shall be fined not more than $10,000 and shall be sentenced to a term of imprisonment not to exceed 15 years and a mandatory-minimum term of not less than 5 years and shall not be released on parole prior to serving the mandatory-minimum sentence.

**§ 306. Receiving a stolen firearm; penalty.**

(a)     Receiving. A person is guilty of receiving a stolen firearm if he or she purposely receives, retains, or disposes of property of another knowing that it has been stolen, or having reasonable cause to believe under all of the circumstances that it has probably been stolen. It is an affirmative defense that the property is received, retained, or disposed with purpose to restore it to the owner.

(b)     "Receiving" means acquiring possession, control or title, or lending on the security of the property.

(c)     Upon conviction of a violation of this section, the person shall be fined not more than $10,000 and shall be sentenced to a term of imprisonment not to exceed 15 years and a mandatory-minimum term of not less than 5 years and shall not be released on parole prior to serving the mandatory-minimum sentence.

**§ 307. Possession of weapons during commission of a felony; penalty.**

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

(a) No person shall within the Commonwealth shall knowingly possess a firearm, imitation firearm, dangerous device or imitation dangerous device, destructive device or imitation destructive device, while committing a felony.

(b) "Possession" as used in this section means simple physical possession, the use of the firearm, imitation firearm, dangerous device or imitation dangerous device, destructive device or imitation destructive device in furtherance of the felony is not an element of the crime.

(c) Upon conviction of a violation of this subsection, the person shall be fined not more than $10,000 and shall be sentenced to imprisonment for a term not to exceed 15 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 5 years and shall not be released on parole, or granted probation or suspension of sentence, prior to serving the mandatory-minimum sentence.

**§ 308. Use of weapons in furtherance of a crime of violence; penalty.**

(a) No person shall within the Commonwealth possess a firearm, imitation firearm, dangerous device or imitation dangerous device, destructive device or imitation destructive device, while committing a crime of violence.

(b) For purposes of this section the term "crime of violence" means an offense that

(1) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

**SENATE BILL NO. 19-94, SD1, HD10**

 (2) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

 (3) The following crimes, however styled in the Commonwealth Code, shall be considered "crimes of violence":

  (A) aggravated assault;

  (B) act of terrorism;

  (C) arson;

  (D) assault on a law enforcement officer ;

  (E) assault with a dangerous weapon;

  (F) assault with intent to kill, commit first degree sexual abuse, commit second degree sexual abuse, first or second degree sexual assault or commit child sexual abuse; and any acts of domestic and family violence;

  (G) assault with significant bodily injury;

  (H) assault with intent to commit any other offense;

  (I) burglary;

  (J) carjacking;

  (K) armed carjacking;

  (L) child sexual abuse;

  (M) cruelty to children in the first degree;

**SENATE BILL NO. 19-94, SD1, HD10**

(N) extortion or blackmail accompanied by threats of violence;

(O) gang recruitment, participation, or retention by the use or threatened use of force, coercion, or intimidation;

(P) kidnapping;

(Q) malicious disfigurement;

(R) manslaughter;

(S) manufacture or possession of a weapon of mass destruction;

(T) mayhem;

(U) murder;

(V) robbery;

(W) sexual abuse in the first, second, or third degrees and sexual assault in the first, second or third degree;

(X) use, dissemination, or detonation of a weapon of mass destruction; or

(Y) an attempt, solicitation, or conspiracy to commit any of the foregoing offenses.

(4) The list of offenses in subsection (3) is not exclusive.

(c)   If the crime of violence in subsection (b) was a felony under Commonwealth law at the time of commission, then upon conviction of a violation of this subsection, the person shall be fined $10,000 and shall be sentenced to imprisonment for a term not to exceed 15 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 5 years and shall not be released on parole, or granted probation or suspension of sentence, prior to serving the mandatory-minimum sentence.

(d)   If the crime of violence in subsection (b) of this section was a misdemeanor under Commonwealth law at the time of commission, then upon conviction of a violation of this subsection the person shall be fined $1,000 and shall be sentenced to imprisonment for a term not to exceed one year and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 9 months and shall not be released on parole, or granted probation or suspension of sentence, prior to serving the mandatory-minimum sentence.

**§ 309. Possession of certain dangerous weapons prohibited.**

(a)   No person shall possess any machine gun, sawed-off shotgun, knuckles, or any instrument or weapon of the kind commonly known as a blackjack, slungshot, sand club, sandbag, switchblade knife, butterfly knife, nor any other dangerous device or destructive device as defined in this Division.

(b)   No person shall possess any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms.

(c)   Whoever violates this section shall be punished shall be punished by a fine of not more $2,500 or imprisonment for not more than 1 year, or both. However, if the violation occurs after such person has been convicted in the Commonwealth of a violation of this Division, or of a felony, either in the Commonwealth or in another jurisdiction, in which case such person shall be imprisoned for not more than 10 years, and may be fined not more than $25,000.

### § 310. Removal of Firearm Serial Numbers Prohibited.

(a)   Whoever commits any of the following acts may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both:

      (1)   obliterates, removes, changes, or alters the serial number or other identification of a firearm;

      (2)   receives or possesses a firearm, the serial number or other identification of which has been obliterated, removed, changed, or altered; or

      (3)   receives or possesses a firearm that is not identified by a serial number.

### § 311. Seizure and forfeiture of conveyances.

(a)   For the purposes of this section, the term "owner" means a person with an ownership interest in the specific conveyance sought to be forfeited. The term "owner" does not include:

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

       (1)    A person with only a general unsecured interest in, or claim against, the conveyance;

       (2)    A bailee; or

       (3)    A nominee who exercises no dominion or control over the conveyance.

  (b)    Any conveyance, including motor vehicles, vessels, and airplanes, in which any person or persons transport or possess a firearm while committing a misdemeanor or felony offense under this Division, shall be seized and forfeited to the Commonwealth, provided that:

       (1)    No conveyance used by any person as a duly licensed common carrier in the course of transacting business as a licensed common carrier is subject to forfeiture under this section unless it appears that the owner or other person in charge of the conveyance is a consenting party or has knowledge of a violation of this section; and

       (2)    The forfeiture of a conveyance encumbered by a bona fide security interest is subject to the interest of the secured party if the secured party neither had knowledge of, nor consented to, the illegal act giving rise to forfeiture.

       (3)    An innocent owner's interest in a conveyance which has been seized shall not be forfeited under this section. A person is an

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

innocent owner if he or she establishes, by a preponderance of the evidence:

(Z) That he or she did not know that a person or persons in the conveyance was transporting, possessing, or concealing any firearm or that the conveyance was involved in or was being used in the commission of any illegal act involving any firearm; or

(AA) That, upon receiving knowledge of the presence of any illegal firearm in or on the conveyance or that the conveyance was being used in the commission of an illegal act involving a firearm, he or she took action to terminate the presence in or on the conveyance of the person, persons, or firearms.

(4) A claimant who establishes a lack of knowledge under subsection (b)(3)(Z) of this section shall be considered an innocent owner unless the government, in rebuttal, establishes the existence of facts and circumstances that should have created a suspicion that the conveyance was being or would be used for an illegal purpose. In that case, the claimant must establish that, in light of such facts and circumstances, he or she did all that reasonably could be expected to prevent the

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

that reasonably could be expected to prevent the use of the conveyance in the commission of any such illegal act.

(BB)     A person who willfully blinds himself or herself to a fact shall be considered to have had knowledge of that fact.

(CC)     Except as otherwise expressly provided by this section, all seizures and forfeitures of conveyances under this section shall follow the procedures set forth in 6 CMC § 2150."

**Section 8. <u>Amendment</u>.** Subject to codification by the Law Revision Commission, Title 6, Division 10 of the Commonwealth Code is amended by adding Chapter 4, which shall read as follows:

**"Chapter 4. Gun Free Zones.**

**§ 401. Gun Free Zones.**

(a)     No person in the Commonwealth, other than duly authorized law enforcement officers in the exercise of their duties, shall possess a firearm in any of the following places:

(1)     Any building occupied primarily by the government and any parking lot therefor, except for security personnel given express permission to carry a firearm.

(2)     Any government building, except for security personnel given express permission to carry a firearm;

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

(3)    Any Department of Public Safety building or office without the consent of the chief law enforcement officer in charge of that office or station;

(4)    Within five hundred feet of any polling place on any election day;

(5)    Within five hundred feet of any daycare center any portion of a building used as a child care facility without the consent of the manager or owner. Nothing in this subsection shall prevent the operator of a child care facility in a family home from owning or possessing a firearm;

(6)    Within five hundred feet of any adult or juvenile detention or correctional institution, prison or jail;

(7)    Within five hundred feet of any courthouse, or any courtrooms, administrative offices, libraries or other rooms of any such court whether or not such court solely occupies the building in question. This subdivision shall also include, but not be limited to, any juvenile, family, drug, or other court offices, any room or office wherein any of the courts or offices listed in this subdivision are temporarily conducting any business within the jurisdiction of such courts or offices. Nothing in this subdivision shall preclude those who serve in

SENATE BILL NO. <u>19-94, SD1, HD10</u>

a law enforcement capacity for a court or as may be specified by court rule;

(8)    Within five hundred feet of any building owned, leased or controlled by the non-government agencies or programs that specifically help victims of domestic violence, sexual violence, and stalking;

(9)    Within five hundred feet of any building hosting a public meeting subject to the Open Government Act or any meeting of the legislature;

(10)   Within five hundred feet of any building owned, leased or controlled by the legislature;

(11)   Within five hundred feet of any building owned, leased or controlled by the Office of the Attorney General;

(12)   Within five hundred feet of any place of worship, unless leadership of a particular place of worship, however governed, elects to allow firearms;

(13)   Any establishment licensed to dispense intoxicating liquor for consumption on the premises;

(14)   Within five hundred feet of any establishment containing poker machines or that engages in gambling, except for security personnel given express permission to carry a firearm;

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

(15)    Any place where the carrying of a firearm is prohibited by federal law;

(16)    Within one thousand feet of any higher education institution or early childhood development facility, elementary or secondary school facility, except for security personnel given express permission to carry a firearm;

(17)    Any hospital and any public or private clinics accessible by the public. Possession of a firearm in a vehicle on the premises of a hospital shall not be a criminal offense so long as the firearm is kept in accordance with Chapter 2, § 206 of this Act.

(18)    Any private property whose owner, lessee, or manager has posted the premises as being off-limits to firearms by means of one or more signs displayed in a conspicuous place of a minimum size of eleven inches by fourteen inches with the writing thereon in letters of not less than one inch. The owner, business or commercial lessee, manager of a private business enterprise, or any other organization, entity, or person may prohibit persons from carrying firearms on the premises and may prohibit employees, not authorized by the employer, from carrying firearms on the property of the employer. An

employer may prohibit employees or other persons from carrying a firearm in vehicles owned by the employer.

### § 402. Gun Free Zones: Criminal Penalty.

(a)     It shall be a felony punishable by a fine of not more than $10,000 or imprisonment for not more than 10 years, or both, for any person to knowingly possess a firearm in any location specified by section § 401 (a)of this chapter.

### § 403. Gun Free Zones: Civil Cause of Action

(a)     If a person possesses a firearm on private property in violation of §401(a)(18) of this chapter, then the property owner may institute and prosecute in his own name and on his own behalf, a civil action for injunctive relief, for any damages actually incurred, punitive damages, and for statutory damages in an amount not less than $10,000. Further, the property owner shall be entitled to attorney fees if he prevails in his action against the person found to have violated § 401(a)(18) of this chapter.

(b)     The term "property owner" is to be read broadly to include, among others, owners of freehold estates, leasehold estates, owners and operators of private businesses.

### § 404. Gun Free Zones: Exceptions.

(a)     The provisions of this chapter regarding the possession of firearms do not apply to:

        (1)     United States Marshals while engaged in the operation of their official duties;

**SENATE BILL NO. <u>19-94</u>, <u>SD1</u>, <u>HD10</u>**

(2) Law enforcement, while engaged in the operation of their official duties;

(3) Any member of law enforcement that keeps a firearm in a motor vehicle in accordance with Chapter 2, § 206 of this Act;

(4) Members of the Armed Forces of the United States or the National Guard, while engaged in the operation of their official duties;

(5) Federal officials required to carry firearms, while engaged in the operation of their official duties;

(6) Any federal official required to carry firearms that keeps a firearm in a motor vehicle in accordance with Chapter 2, § 206 of this Act;

(7) Members of bona fide veterans' organizations which receive firearms directly from the armed forces of the United States, while using the firearms for ceremonial purposes with blank ammunition;

(8) Color guards of bona fide veterans' organizations or members of bona fide American Legion bands while using firearms for ceremonial purposes with blank ammunition;

(9)     Any person who temporarily possesses a firearm while participating in a firearms training and safety class conducted by a firearms instructor;

(10)    Any person present at a shooting range;

(11)    Any person lawfully possessing a firearm on their person or in their vehicle and moving upon the highways, roads, or sidewalks of the Commonwealth in accordance with Chapter 2, § 206.

(12)    Any person that lawfully resides within a gun free zone under this Division may possess firearms in their home or on their property and may transport said firearms from or to their home or property in accordance with Chapter 2, § 206 this Act."

**Section 9. Amendment.**     Subject to codification by the Law Revision Commission, Title 6, Division 10 of the Commonwealth Code is amended by adding Chapter XX, Minimum Criminal Penalties.

"Section 101.   Where ever a maximum criminal penalty is imposed in Title 6, Dvision 10, there shall be a minimum penalty equal to 10% of the maximum penalty."

**Section 10. Amendment.** Subject to codification by the Law Revision Commission, Title 6, Division 10 of the Commonwealth Code is amended by adding Chapter 5, which shall read as follows:

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

"**Chapter 5. Transition.**

§ **501. Transition - Security mortgages, deposits, or pawns with firearms, destructive devices, or ammunition prohibited; loan or rental of firearms, destructive devices, or ammunition prohibited.**

(a)　Chapter 2, § 201 of this Act shall not apply to any firearm or ammunition lawfully pledged, pawned, or received as security under the Commonwealth Weapons Control Act prior to the effective date of the Special Act for Firearms Enforcement.

§ **502. Transition – Illegal weapons and unregistered firearms**

(a)　The Department of Public Safety shall not register, and shall seize, any unregistered firearm that was present in the Commonwealth prior to the effective date of the Special Act for Firearms Enforcement. This provision shall not apply to individuals that were unable to register their firearms because they were not a United States citizen or national under the former language of 6 CMC § 2204(l).

(b)　The Department of Public Safety shall not register, and shall seize, any illegal firearm or firearm that was illegally present in the Commonwealth prior to March 29, 2016.

(c)　A firearm vendor shall not sell or transfer any unregistered firearm, illegal firearm, or firearm that was illegally present in the Commonwealth prior to the effective date of the Special Act for Firearms Enforcement. A firearm vendor

SENATE BILL NO. <u>19-94, SD1, HD10</u>

1    shall immediately notify the Department of Public Safety if the vendor acquires

2    any of the firearms described in this section."

3    **Section 11.  <u>Amendment</u>**.  Subject  to  codification  by  the  Law  Revision

4    Commission, Title 3, Division 2, Chapter 5, Article 1 of the Commonwealth Code is

5    amended by establishing a new section which shall read as follows:

6    **"§ xxx. Seizure of Firearms.**

7    (a)    A law enforcement officer who takes a person into custody pursuant to the

8           Involuntary Civil Commitment Act may immediately seize any firearm or

9           ammunition found in possession of the person. After seizing a firearm or

10          ammunition under this subsection, the Department of Public Safety shall

11          comply with the requirements of this Section.

12              (1)    A  law  enforcement  officer  who  seizes  a  firearm  or

13                     ammunition from a person taken into custody under the

14                     Involuntary Civil Commitment Act shall promptly provide the

15                     person a receipt for the firearm or ammunition and a written

16                     notice  of  the  procedure  for  the  return  of  a  firearm  or

17                     ammunition.

18    (b)    If a person to whom written notice is provided or another lawful owner of a

19           firearm subject to disposition under this section does not submit a written

20           request to the Department of Public Safety for the return of the firearm or

21           ammunition before the 121st day after the date the Department seizes the

22           firearm or ammunition, the Department may sell, destroy, or otherwise dispose

**Public Law No. 19-42**

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

1    of the firearm or ammunition as provided by law. The proceeds from the sale of

2    a firearm under this subsection shall be given to the owner of the seized

3    firearm, less the reasonable costs of administering this section."

4    **Section 12.  <u>Amendment</u>.** Subject to codification by the Law Revision

5    Commission, 6 CMC § 2301(a)(3) is hereby repealed and reenacted which shall read as

6    follows:

7    **"§ 2301(a)(3).  Firearms and ammunition.**

8    (i)    The terms used in this section shall have the same meaning as the terms defined

9    in Chapter 1, § 101 of the SAFE Act.

10    (ii)    Any firearm that cannot be lawfully possessed by a private person.

11    (iii)    Any large capacity ammunition feeding device regardless of whether the device

12    is attached to a firearm. For the purposes of this subsection, the term "large

13    capacity ammunition feeding device" means a magazine, belt, drum, feed strip,

14    or similar device that has a capacity of, or that can be readily restored or

15    converted to accept, more than 10 rounds of ammunition. The term "large

16    capacity ammunition feeding device" shall not include an attached tubular

17    device designed to accept, and capable of operating only with, .22 caliber

18    rimfire ammunition.

19    (iv)    Any restricted pistol bullet or any restricted bullet.

20    (v)    The following individuals, organizations, and agencies are exempt from this

21    subsection:

**Public Law No. 19-42**

**SENATE BILL NO. <u>19-94, SD1, HD10</u>**

(1)     United States Marshals, while engaged in the operation of their official duties;

(2)     Members of the Armed Forces of the United States or the National Guard, while engaged in the operation of their official duties;

(3)     Members of law enforcement, while engaged in the operation of their official duties;

(4)     A gunsmith who is in possession or seeks possession of a firearm solely for the purposes of service or repair;

(5)     A common carrier, warehouseman, or other person engaged in the business of transporting or storing goods, to the extent that the possession or receipt of any firearm is in the ordinary course of business, not for the personal use of any such person, and at the behest of a person, agency, or organization exempted under this subsection.

(6)     A person lawfully transporting a firearm through the Commonwealth in accordance with 18 U.S.C. § 926A; or

(7)     Federal officials required to carry firearms, while engaged in the operation of their official duties."

**Section 13. <u>Amendment</u>**. 4 CMC § 1407(b) is hereby amended to read as follows:

**SENATE BILL NO. 19-94, SD1, HD10**

1       "(b) *Customs Inspection and Clearance Required.* In the case of those goods,

2   commodities, resources, or merchandise whose first use in the Commonwealth requires

3   customs inspection and clearance, payment shall be made within 30 days after entry. Such

4   goods, commodities, resources, or merchandise may be released prior to payment of excise

5   tax and upon the submission of the bill of lading and/or manifest or invoice or any other

6   form prescribed by the secretary. Where the actual amount of tax cannot be determined

7   within seven calendar days after the entry, an estimated tax shall be paid within 30 days

8   after entry, subject to later adjustment. <u>However, firearms may not be released until</u>

9   <u>complete payment of all taxes due and owing is made, and upon a showing that the firearm</u>

10   <u>has been properly registered and that the owner has a valid Weapons Identification Card or</u>

11   <u>Firearms Identification Card.</u>"

12       **Section 14.** A. 4 CMC §1402 is temporarily amended by adding a new subsection

13   as follows:

14       "(h) Pistols. $1,000.00 per pistol. Pistol shall have the same meaning as set

15       forth in Title 6, Division 10 of the Commonwealth Code. The exemption for Non-

16       Business Use, §1402(d) shall not apply to the excise tax imposed on pistols. This

17       provision shall automatically expire one year after the effective date of this law.

18       B. The following is hereby enacted.

19       The Governor shall immediately commission and fund a study to be conducted by

20   suitable professionals in order to determine the true costs to the Commonwealth, its

21   government, businesses, non-profits, and the people, of the introduction of the additional

22   types of firearms required by the recent District Court ruling into our society. The results

SENATE BILL NO. 19-94, SD1, HD10

1    of that study shall be delivered to the Governor and the Legislature so that suitable

2    legislation can be proposed and adopted creating a taxation scheme that will require the

3    payment of these costs by the people and companies that seek to import or otherwise

4    introduce these additional firearms into the Commonwealth, at least 60 days before the

5    expiration of the temporary excise tax imposed on pistols."

6    **Section 15. <u>Special Provision on Fines and Fees.</u>**

7    "All fines and fees collected pursuant to this Act shall be distributed accordingly:

8    (A) Fifty Percent (50%) to the Department of Public Safety (DPS) for its personnel

9        and operations in enforcing the intent of this Act, the Commissioner of DPS

10       shall be the expenditure authority of the funds allocated under subsection (A) of

11       this section;

12   (B) Ten Percent (10%) to the Division of Customs under the Department of Finance

13       for its operations in enforcing the intent of this Act, the Secretary of the

14       Department of Finance shall be the expenditure authority of the funds allocated

15       under subsection (B) of this section;

16   (C) Ten Percent (10%) to the Department of Corrections (DOC) for its operations

17       in enforcing the intent of this Act at the DOC, the Commissioner of DOC shall

18       be the expenditure authority of the funds allocated under subsection (C) of this

19       section;

20   (D) Ten Percent (10%) to the Division of Alcohol Beverage and Tobacco Control

21       (ABTC) under the Department of Commerce for its operations in enforcing its

22       authority on businesses within the Commonwealth of the Northern Mariana

SENATE BILL NO. <u>19-94, SD1, HD10</u>

Islands, the Secretary of the Department of Commerce shall be the expenditure authority of the funds under subsection (D) of this section; and

(E) Twenty Percent (20%) shall be reserved for all government buildings within the Commonwealth of the Northern Mariana Islands for the purchasing of proper security systems and other necessary equipment needed to upgrade the safety of the people within the government buildings, the Secretary of the Department of Finance shall be the expenditure authority of the funds under subsection (E) of this section."

**Section 15. <u>Amendment</u>**. 6 CMC § 2204(l) is repealed and reenacted to read as follows:

"(l) Only a person who is a United States Citizen, a United States National, or a lawful permanent resident of the United States and a bona fide resident of the Commonwealth is eligible for an identification card or for renewal thereof. A bona fide resident of the Commonwealth means a person whose place of general abode is in the Commonwealth of the Northern Mariana Islands."

**Section 16. <u>Severability</u>**. If any provision of this Act or the application of any such provision to any person or circumstance should be held invalid by a court of competent jurisdiction, the remainder of this Act or the application of its provisions to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

**Section 17. <u>Effective Date</u>**. This Act shall take effect upon approval by the Governor or upon becoming law without such approval.

Public Law No. 19-42

SENATE BILL NO. <u>19-94, SD1, HD10</u>

CERTIFIED BY:

_____
FRANCISCO M. BORJA
PRESIDENT OF THE SENATE

ATTESTED BY:

_____
TERESITA A. SANTOS
SENATE LEGISLATIVE SECRETARY

Approved this 11th day of April, 2016

_____
RALPH DLG. TORRES
Governor
**Commonwealth of the Northern Mariana Islands**



*Nineteenth Legislature*
*of the*
*Commonwealth of the Northern Mariana Islands*

# IN THE HOUSE OF REPRESENTATIVES

Seventh Day, Third Regular Session

### March 31, 2016

REPRESENTATIVE VINSON F. SABLAN of Saipan, Precinct 4 (*for himself*, Representatives Edwin P. Aldan, Blas Jonathan "BJ" T. Attao, Anthony T. Benavente, Roman C. Benavente, George N. Camacho, Joseph P. Deleon Guerrero, Lorenzo I. Deleon Guerrero, Angel A. Demapan, Rafael S. Demapan, Joseph Lee Pan T. Guerrero, Glenn L. Maratita, Edwin K. Propst, Antonio P. Sablan, John Paul P. Sablan, Francis S. Taimanao, Ramon A. Tebuteb, Edmund S. Villagomez, and Ralph N. Yumul,) introduced the following Resolution in an open and public meeting with an opportunity for the public to comment, and appeared on the House Session Agenda of: March 31, 2016 and April 4, 2016

---

## H. RES. 19-44

### A HOUSE RESOLUTION

*To respectfully urge the CNMI Attorney General to appeal to the Ninth Circuit Court of Appeals of the ruling of the CNMI District Court's decision in Radich et al. v. Deleon Guerrero et al.*

**WHEREAS,** the Commonwealth of the Northern Mariana Islands is unique and special to the United States of America to the extent that the Covenant legally limits the application of the United States Constitution to the CNMI and that these limits were established by the framers of the Covenant, unlike anywhere else in America; and

**WHEREAS,** the right to bear arms has always been respected and honored in the Commonwealth, consistent with the Second Amendment of the U.S. Constitution, that was made applicable to the NMI via the Covenant; and

**WHEREAS,** the framers of the Covenant establishing the Commonwealth of the Northern Marianas Islands perceived the right to bear arms in the Northern Mariana Islands as a right that did not include hand guns because these types of firearms were foreign to our culture, absent from our society, and unnecessary for self-defense; and

**WHEREAS,** the Covenant framers' intentions with regards to the application of the Second Amendment to the Commonwealth contemplated a right to bear arms that did not expressly include hand guns in the Northern Mariana Islands; and

**WHEREAS,** the U.S. Supreme Court case that was principally relied upon by the CNMI District Court: *District of Columbia v. Heller*, stated: "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad" and

**WHEREAS,** contrary to the history of the Commonwealth, the Court in *District of Columbia v. Heller*, held that "the American people have considered the handgun to be the quintessential self-defense weapon" as the primary reason for striking down the handgun ban; and

**WHEREAS,** *District of Columbia v. Heller*, was the result of a 5-4 decision where Justice Scalia, a member of the majority, has now passed away, leaving the Supreme Court with 4 justices who support the ruling and 4 justices who dissented with the holding; and

**WHEREAS,** the CNMI District Court decision in *Radich et al., v. Deleon Guerrero et al.*, effectively declared the CNMI's ban on firearms unconstitutional by dismissing the history and traditions of the Northern Marianas, as legally "irrelevant" to its legal analysis which focused entirely upon the national history of the Second Amendment—a history that admittedly failed to consider the NMI's unique circumstances where civilian use of hand guns was non-existent; and

**WHEREAS,** the District Court ruling will have far reaching intended effects on the firearms laws of the CNMI and the manner in which they are enforced; and

**WHEREAS,** the unintended effects of the District Court ruling will be significant and potentially life-threatening; and

**WHEREAS,** the Attorney General of the CNMI has been entrusted to protect the people of the CNMI and the laws by which they are governed; and

**WHEREAS,** the Attorney General is duty bound to exhaust any and all legal remedies in response to the District Court's ruling because of the foreseeable and unforeseeable inevitable effects of the increased presence of hand guns in the CNMI; and

**WHEREAS,** the appeal of the District Court ruling to the Ninth Circuit Court of Appeal will be in the best interests of the health and safety of the people of the Northern Mariana Islands, such that it is the fiduciary and ethical duty for the Attorney General to protect and defend these legitimate interests; and

**WHEREAS,** the exercise of the right to appeal the decision of the District Court is the only means to ensure that this decision is legally sound and accurately interpreted in terms of the right to bear arms in self-defense; and

**WHEREAS,** failing to avail of the right to appeal the decision of the District Court only serves to guarantee failure;

**NOW, THEREFORE, BE IT RESOLVED** by the House of Representatives of the Nineteenth Northern Marianas Commonwealth Legislature that the House respectfully urges the CNMI Attorney General to appeal to the Ninth Circuit Court of Appeals of the ruling of the CNMI District Court's decision in *Radich et al. v. Deleon Guerrero et al.*

**BE IT FURTHER RESOLVED** that the Speaker of the House of Representatives shall certify, and the House Clerk shall attest to the adoption of this resolution and thereafter the House Clerk shall transmit a certified copy to the Honorable Edward M. Manibusan, Attorney General, Office of the Attorney General; the Honorable Ralph DLG. Torres, Governor of the Commonwealth of the Northern Mariana Islands; the Honorable Gregorio Kilili Camacho Sablan, CNMI Delegate to the 114th United States Congress; and the Honorable Francisco M. Borja, Senate President to the Nineteenth Northern Marianas Commonwealth Legislature.

*Duly adopted on the 4th day of April, 2016*

*Attested to by:* _____

Linda B. Muña, *House Clerk*

*Certified by:* _____

**SPEAKER RAFAEL S. DEMAPAN**

Page 3

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that Appellant's Brief was filed with the Court, and served on Appellees' counsel, on October 17, 2016, by using the appellate CM/ECF system.

Dated this 17th day of October, 2016.

/s/ *Joseph E. Horey*          .
JOSEPH E. HOREY

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that Appellant's Brief was filed with the Court, and served on Appellees' counsel, on October 17, 2016, by using the appellate CM/ECF system.

Dated this 17th day of October, 2016.

/s/ *Joseph E. Horey* .
JOSEPH E. HOREY